KTC:TH
F. #2004R01979

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

   - against -                              05-CR-104 (NG)

SHAHAWAR MATIN SIRAJ,

              Defendant.

- - - - - - - - -  - - - - - - - - X

GOVERNMENT'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTIONS

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York
One Pierrepont Plaza
Brooklyn, New York 11201

Todd Harrison
Assistant U.S. Attorney
(718) 254-7580

**PRELIMINARY STATEMENT**

The government respectfully submits this memorandum in opposition to defendant Siraj's motion, dated July 20, 2005, in which he argues that: 1) 18 U.S.C. § 2332(f) violates the Equal Protection Clause of the United States Constitution; 2) the four counts of the indictment are multiplicitous; 3) the Court should grant discovery and inspection of certain statements of the defendant; 4) the Court should order the disclosure of any Brady material; 5) the defendant's post-arrest statements to law enforcement should be suppressed.  For the reasons stated below, Siraj's motions should be denied in their entirety.

**Factual Background**

During the course of 2003 and 2004 the New York City Police Department conducted an investigation into the activities of defendant Siraj.  During that time a confidential informant ("CI") had numerous conversations with Siraj.  In approximately June 2004 the CI began to tape his conversations with Siraj and another individual.  Siraj was subsequently arrested on August 27, 2004 in Brooklyn, New York and transported to the offices of the Federal Bureau of Investigation, located at 26 Federal Plaza in Manhattan.

After arriving at 26 Federal Plaza, law enforcement officials read Miranda warnings to Siraj.  Siraj indicated that he understood his Miranda rights and signed a Miranda waiver form

2

(attached as Exhibit A). Siraj then made oral statements to law enforcement regarding the charges against him. See copy of agent's report of statement, attached as Exhibit B.

On February 9, 2005 a federal grand jury returned a four-count indictment against Siraj, in which he was charged with: 1) conspiring to maliciously damage and destroy, by means of an explosive, a building, vehicle and other real property, to wit: the 34th Street subway station at Herald Square, in violation of 18 U.S.C. §§ 844(i) and (n); 2) conspiring to wreck, derail and disable a mass transportation vehicle, to wit: a subway car located in the 34th Street subway station at Herald Square, in violation of 18 U.S.C. §§ 1993(a)(1) and (a)(8); 3) conspiring to place a destructive device in, upon and near a garage, terminal, structure, supply and facility used in the operation of a mass transportation vehicle, to wit: the 34th Street subway station at Herald Square in New York, New York, without previously obtaining the permission of the mass transit provider, to wit: the New York City Metropolitan Transit Authority, and knowing and having reason to know that such activity would likely derail, disable and wreck a mass transportation vehicle, in violation of 18 U.S.C. §§ 1993(a)(3) and (a)(8); and 4) conspiring to unlawfully deliver, place, discharge and detonate an explosive and other lethal device in, into and against a public transportation system, to wit: the New York City Metropolitan Transit Authority

subway system, with the intent to cause extensive destruction of such system, where such destruction was likely to result in major economic loss, in violation of 18 U.S.C. § 2332(f).  <u>See</u> copy of indictment attached as Exhibit C.

**Argument**

I.  **18 U.S.C. § 2332(f) does not violate the Equal Protection Clause**

The defendant first argues that 18 U.S.C. § 2332(f), enacted into law as part of the Terrorist Bombings Convention Implementation Act of 2002 (hereinafter the "Terrorist Bombings Act") is unconstitutional because it violates principles of due process and equal protection.  Siraj Br. at 2-5.  The defendant is incorrect and his motion should be denied.

In relevant part, Section 2332(f) provides that an individual who:

> "delivers, places, discharges, or detonates an explosive or other lethal device in, into, or against a place of public use, a state or government facility, a public transportation or an infrastructure facility" faces criminal prosecution whenever:
> (1) the offense takes place in the United States and –
>     (A) is committed against another state or a government facility of such state, including its embassy or other diplomatic or consular premises of that state;
>     (B) the offense is committed in an attempt to compel another state or the United States to do or abstain from doing any act;
>     (C) at the time the offense is committed, it is committed—
>         (i) on board a vessel flying the flag of another state;
>         (ii) on board an aircraft which is registered under the laws of another state; or

4

```
                  (iii) on board an aircraft which is operated by
                        the government of another state;
            (D) a perpetrator is found outside the United States;
            (E) a perpetrator is a national of another state or a
                stateless person;
            (F) a victim is a national of another state or a
                stateless person...
```
18 U.S.C. § 2332(f).

As an initial matter, Siraj's insistence that 2332(f) exclusively criminalizes terrorist acts perpetrated by aliens, while excluding altogether U.S. citizens engaged in similar activities, is simply incorrect. A plain reading of the statute clearly indicates that both United States citizens and aliens alike may be prosecuted under Section 2332(f) for the same underlying conduct prohibited in section (a), as long as the perpetrators' status, or their actions, also meet one of the jurisdictional prerequisites listed in section (b).

However, there are scenarios in which an alien could be prosecuted under Section 2332(f) and a United States citizen could not - for instance where, as in the case at bar, the defendant is charged under Section 2332(f)(b)(1)(E) and jurisdiction is therefore predicated upon the fact that the defendant is a foreign national. However, because Congress has plenary authority to enact foreign treaties and to deal with alienage issues, this disparate treatment does not render the statute unconstitutional.

5

A.   <u>The Terrorist Bombings Act of 2002</u>

The International Convention for the Suppression of Terrorist Bombings (hereinafter the "Convention") was adopted by the United Nations General Assembly in December 1997 and signed by the United States in January 1998.  On December 5, 2001 the Senate ratified the treaty by unanimous consent.  <u>See</u> 148 Cong. Rec. S5569-01.  The Convention was then passed by both houses of Congress as the "Terrorist Bombings Act of 2002" (hereinafter, the "Act") and signed into law by the President on June 25, 2002.

One of the main purposes of enacting the Convention into law was to advance key U.S. foreign policy objectives by bringing the U.S. into "immediate compliance" with the Convention.  <u>See</u> 148 Cong. Rec. S5569-01, statement of principal sponsor Senator Leahy, June 14, 2002.  Indeed, the "basic purpose of the bill [H.R. 3275]" was to implement the Convention.  <u>Id</u>.  Senator Leahy emphasized that treaty compliance demanded adoption of each provision of H.R. 3275: "Both treaties require the signatory nations to enact certain, precisely worded criminal provisions in their laws in order to be in compliance."  <u>Id</u>.  Therefore, inclusion of § 2332(f)(b)(1)(E), the alienage prong, was necessary for full compliance with the Convention.

Section 2332(f) was not only deemed vital for compliance with the Convention but also essential to "fight terrorism at home and abroad."  <u>Id</u>.  Implementation of treaty provisions by

6

signatory nations created a seamless web of "universal jurisdiction" to prosecute international terrorists, who had previously exploited jurisdictional loopholes.  Thus, Senator Leahy stated that the adoption of the Convention was "important to insure that all nations have in place laws to enable full and effective international cooperation against terrorism."  Id. Further, Congress recognized that failure to ratify the treaty would provide political cover for foreign nations reluctant to cooperate with the United States in the global war on terrorism: "The Leahy bill would bring us into full compliance with those important obligations and take away an excuse from nations that are hesitant to cooperate in the war against terrorism."  Id.  It is therefore clear from the legislative history that Congress enacted Section 2332(f) and the related statutes in order to both combat terrorist bombings and to fulfill more general American foreign policy aims in joining with other countries to combat terrorism.

B.   The Standard of Review

The Supreme Court has long recognized that Congress has the power to pass laws that regulate the conduct of noncitizens within our borders and that these laws do not violate equal protection principles so long as they are rationally related to a legitimate government interest.  See Mathews v. Diaz, 426 U.S. 67, 82 (1976)("[A]ny policy toward aliens is vitally and

7

intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). Indeed, the defendant concedes in his motion that in the instant case the government need only demonstrate a "rational basis" to support Section 2332(f) – the lowest level of judicial scrutiny. Siraj Br. at 3.

Additionally, federal courts have repeatedly denied equal protection challenges to statutes simply because they treat aliens differently than U.S. citizens. For instance, the Second Circuit denied an equal protection challenge to a statute which criminalizes the receipt, possession, or transportation of firearms by an illegal alien. United States v. Toner, 728 F.2d 115, 129 (2d Cir. 1984). In upholding the statute, the Second Circuit stated that this disparate treatment of aliens was rationally related to Congress' legitimate goal of preventing crime: "No one would dispute that the statute strikes broadly -- that was the expressed Congressional intention -- and that not all illegal aliens (or ex-felons, for that matter) are disreputable, or unworthy of society's trust. But that is not the issue, and we believe that the prohibition of the statute bears a rational basis to its justifiable goals." Id. (internal

8

citation omitted).

C. <u>The Terrorist Bombings Act Meets the "Rational Basis" test</u>

The Terrorist Bombings Act, of which Section 2332(f) is a part, is rationally related to a legitimate government interest, and does not violate the Equal Protection Clause, for two reasons: 1) the Act is designed to further Congress' legitimate interest in combating terrorism and the potential for terrorist attacks; and 2) the Act is rationally related to Congress' legitimate interest in maintaining foreign affairs, as the Act was passed in order to comply with the Senate's ratification of the International Convention for the Suppression of Terrorist Bombings.

> i. Section 2332(f) is Rationally Related to Congress' Legitimate Interest in Combating Terrorism as a National Security Objective

Distinctions based on alienage will survive constitutional attack when rationally related to national security aims. <u>United States v. Lue</u>, 134 F.3d 79, 87 (2d. Cir 1998); <u>see</u> <u>also</u> <u>Harisiades v. Shaughnessy</u>, 342 U.S. 580, 587 (1952)("... it does not require war to bring the power of deportation into existence or to authorize its exercise. Congressional apprehension of foreign or internal dangers short of war may lead to its use. So long as the alien elects to continue the ambiguity of his allegiance his domicile here is held by a precarious tenure."). In <u>Lue</u>, for example, the Second Circuit recognized an especially

9

compelling federal interest in enforcement of the Hostage Taking Act (codified at 18 U.S.C. § 1203), which made it a crime for an alien to take any individual hostage in the United States. Lue, 134 F.3d at 87. In that case, the Second Circuit concluded that criminalizing such acts by aliens – while excluding U.S. citizens engaged in similar conduct - rationally related to legitimate national security interests: "The classification drawn by the Hostage Taking Act covers all aliens involved in hostage-taking incidents. The asserted purpose of the statute, along with the antecedent Convention, is to address a matter of grave concern to the international community: hostage-taking as a manifestation of international terrorism." Id.

Similarly, in United States v. Lopez-Flores, 63 F.3d 1468 (9th Cir. 1995) the Ninth Circuit also upheld the Hostage Taking Act, concluding that classifying hostage-takers based on alienage was necessary for compliance with international treaties and advanced legitimate anti-terrorism objectives. "Appellants attempt to distinguish their case because the Hostage Taking Act is not an exercise of the Immigration power. Yet the Act was prompted by considerations that are also uniquely federal. Strong foreign policy concerns arising from the increased threat of in-country terrorist attacks and the desire to meet the United States' obligations under international treaties provided the impetus for passage of the Hostage Taking Act." Lopez-Flores, 63

F.3d at 1473. Indeed, enforcement of the Hostage Taking Act rationally relates to national security interests by "send[ing] a strong and vigorous message to friend and foe alike that the United States will not tolerate terrorist activity against its citizens within its borders." Id.

Like the Hostage Taking Act, Section 2332(f) rationally relates to legitimate national security objectives by furthering the war on terrorism. Congress properly enacted the statute to focus on various scenarios in which terrorists may engage to carry out bombing attacks on the United States. By recognizing the common sense possibility that some of those who engage in such attacks may be foreign nationals, as with the Hostage Taking Act, Congress properly brought foreign nationals who commit such specified bombings under the jurisdictional scope of Section 2332(f).

> ii. Section 2332(f) is Rationally Related to Congress' Legitimate Interest in Promoting U.S. Foreign Policy Aims

Classifications based on alienage will also survive constitutional attack when rationally related to U.S. foreign policy interests. See Lue, 134 F.3d at 87 ("... Congress rationally concluded that a hostage taking within our jurisdiction involving a noncitizen is sufficiently likely to involve matters implicating foreign policy or immigration concerns as to warrant a federal criminal proscription.").

11

Distinctions based on alienage that implicate U.S. foreign policy are presumptively constitutional and will only rarely be overturned by a federal court.  See Mathews v. Diaz, 426 U.S. at 81 (stating that the judiciary should defer to congressional classifications involving alienage, "since decisions in these matters [alien policy] implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary").

This is particularly true where, as here, the statute in question was enacted to bring the United States into compliance with an international treaty.  Indeed, if the United States had not included the alienage provision of which the defendant complains, the United States would not have been in compliance with the Convention.  Article 3 of the Convention states:

> "This Convention shall not apply where the offense is committed within a single State, the alleged offender and the victims are nationals of that State, the alleged offender is found in the territory of that State and no other State has a basis under article 6, paragraph 1 or paragraph 2, of this Convention to exercise jurisdiction, except that the provisions of articles 10 to 15 shall, as appropriate apply in those cases."

Accordingly, in order to be in full compliance with its treaty obligations, the United States had to establish jurisdiction in any situation covered by the Convention unless all of the above

factors in Article 3 were present. Because the defendant in this case is not a U.S. citizen, Article 3 does not apply; and the United States has to have jurisdiction in order to be in compliance with its treaty obligations. However, in order to make the alienage provision relevant to United States' interests, Congress, in Section 2332f(d)(3), added an interstate commerce element to the proscribed offense for situations, such as the one at bar, in which jurisdiction was predicated on the fact that the defendant was a foreign national. See 18 U.S.C. § 2332f(d)(3).

Prosecution of foreign terrorists may have additional foreign policy ramifications that further strengthen the federal interest in separately defining and punishing terrorist acts by aliens. Crimes committed by foreign nationals, and punishment of foreign nationals typically raises delicate political issues, which the federal government is best-equipped to navigate. Further, criminal sanctions enforced against foreign terrorists affect treatment of Americans detained abroad, complicating prosecution decisions. These concerns create a compelling federal interest in defining illicit terrorist activity and prescribing appropriate penalties.

Because the Terrorist Bombings Act of 2002 was similarly enacted both to support Congress' rational interest in fighting specific acts of terrorist bombings, and to further Congress' rational goal of furthering American foreign policy aims, this

13

Court should adopt the reasoning of <u>Lue</u> and <u>Lopez-Flores</u> and deny the defendant's equal protection challenge.

II. <u>The Four Counts of the Indictment are not Multiplicitous</u>

The defendant next argues that the four counts of the indictment are multiplicitous - that they all charge exactly the same crime. The test for multiplicity, that is, the test for whether there are multiple offenses or only one, is to examine "whether each provision requires proof of a fact which the other does not." <u>Blockburger v. United States</u>, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). In the instant case such an analysis clearly demonstrates that the four counts all require proof of facts which the others do not, and thus are not multiplicitous.

The four counts of the indictment charge violations of three different statutes, all of which contain different elements. For instance, Count One requires the Government to prove that the defendant conspired to damage or destroy a "building or ... real property," used in interstate commerce, by means of an explosive. <u>See</u> 18 U.S.C. § 844(n). Count Two, on the other hand, requires the government to prove that the defendant conspired to wreck a "mass transportation vehicle," but does not require the government to prove the element of interstate commerce or that the defendant intended to commit the crime through the use of an explosive. <u>See</u> 18 U.S.C. § 1993(a)(1). Therefore, the elements of Count Two are distinguishable from the elements of Count One

14

in several ways - the type of property targeted, the means used to destroy the target, and the element of interstate commerce.

In order to prove the defendant's guilt on Count Three, the government must prove that the defendant conspired to: 1) place a destructive device; 2) in a facility used in the operation of a mass transit vehicle; 3) without previously obtaining the permission of the mass transit provider; 4) while having reason to know that his actions would likely disable a mass transportation vehicle. See 18 U.S.C. § 1993(a)(3). Count Three therefore differs from Count One in several ways. First, Count Three prohibits placing a destructive device in a facility used by mass transit vehicles, as opposed to Count One, which simply prohibits an attempt to bomb any building or real property. Count Three also requires the government to prove that the defendant had reason to know that the destructive device could wreck a mass transportation vehicle, an element not required under Count One. Finally, Count Three also requires the government to prove that the defendant did not have the permission of the mass transit provider, another element not required by Count One. Count One also requires the government to prove the element of interstate commerce, which is not required by Count Three.

Count Three differs from Count Two in that Count Two requires the government to prove that the defendant intended to

15

wreck a mass transportation *vehicle*, while Count Three requires the government to prove that the defendant intended to destroy a mass transportation *facility*. Count Three also requires the government to prove that the defendant acted without the permission of the mass transit authority, an element not required by Count One.

Count Four requires the government to prove both that the defendant's conspiracy intended to cause "extensive destruction" to a public transportation facility, and that the defendant's purpose was to cause "economic harm." See 18 U.S.C. § 2332(f). These two elements of extensive destruction and intent to cause economic harm distinguish Count Four from the first three counts and clearly demonstrate that Count Four is not multiplicitous in conjunction with the other counts of the indictment. Therefore, for all of the foregoing reasons, the defendant's motion should be denied.

### III. The Defendant's Unrecorded Statements are not Discoverable under Rule 16

The defendant next argues that all of the defendant's statements to the confidential informant made prior to the tape-recorded conversations should be turned over to the defense. Specifically, the defendant requests copies of any reports made by the case agents during debriefings of the confidential informant. Such material, however, is not discoverable under

Rule 16.[1]  The defendant does not explain why he believes he is entitled to such discovery under Rule 16 and cites no legal precedent to support his argument.  His only contention seems to be that such material would be helpful to him.  This is not the legal standard however, and his argument should be rejected.

IV.  <u>The Government is not in Possession of any Brady Material</u>

The defendant makes a broad and nonspecific request for all <u>Brady</u> material.  The government is not aware of any <u>Brady</u> information at this time.  The government is aware of and will comply with its obligation to produce exculpatory material or information as defined under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), including any information or material within the scope of <u>Giglio v. United States</u>, 405 U.S. 150 (1972) and <u>Napue v. Illinois</u>, 360 U.S. 264 (1959).

V.  The Defendant is not Entitled to a Hearing to Suppress his <u>Post-Arrest Statement</u>

The defendant requests that the Court either suppress his post-arrest statement or grant a hearing on the issue.  In support of his motion the defendant submits not his own sworn affirmation but a factual affirmation by his defense counsel, who has no personal knowledge of the events described therein. As a general rule, the movant — <u>i.e.</u>, the defendant — bears the

---

[1] While it is debatable whether such reports constitute statements of a witness under 18 U.S.C. § 3500 material, the government intends to turn over all such reports pursuant to that statute at the time of trial.

initial burden of production and persuasion with respect to a suppression motion.  See United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980).  Consequently, before the government must justify a search, or the voluntariness of a post-arrest statement, a defendant must make an initial demonstration that what occurred was unlawful.  Furthermore, a defendant is not entitled to a hearing upon his motion to suppress unless he (1) states contested facts which, if proven, would entitle him to the relief requested, and (2) supports such factual assertions with either testimony or an affidavit based on personal knowledge.  See, e.g., United States v. Caruso, 684 F. Supp. 84, 87 (S.D.N.Y. 1988) (citing United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967)); United States v. Culotta, 413 F.2d 1343, 1345 (2d Cir. 1969).

An attorney's affidavit made on "information and belief," such as defense counsel has presented here, is insufficient to make that preliminary showing; rather, the defendant *himself* must set forth in an affidavit or testimony facts as to which he has personal knowledge.  See, e.g., Gillette, 383 F.2d at 848-49; United States v. Ruggiero, 824 F. Supp. 379, 393-94 (S.D.N.Y. 1993); United States v. Sierra-Garcia, 760 F. Supp. 252, 264 (E.D.N.Y. 1991) (Glasser, J.); United States v. Gregory, 611 F. Supp. 1033, 1044-45 (S.D.N.Y. 1985); United States v. Barr, 605 F. Supp. 114, 119 n.2 (S.D.N.Y. 1985).  Without an affidavit or

testimony from the defendant that is (i) based on personal knowledge and (ii) contains "specific factual allegations of illegality," Gregory, 611 F. Supp. at 1044, a defendant is not entitled to a hearing on the motion. Id.; see also Gillette, 383 F.2d at 848-49; Caruso, 684 F. Supp. at 87.

Here, the defendant has not submitted a sworn affidavit. The reason for this omission seems apparent; the defendant seeks to raise factual issues while avoiding the consequences attendant to making false, sworn statements. The relevant case law precludes such gamesmanship. Because the defendant has not submitted sworn facts in support of a prima facie case, his motion should be denied without a hearing. See, e.g., United States v. Jailall, No. 00 CR 069, 2000 WL 1368055, at *8 (S.D.N.Y. Sept. 20, 2000) (defendant not entitled to an evidentiary hearing on motion to suppress because he submitted no affidavit of personal knowledge); United States v. Fruchter, 104 F. Supp. 2d 289, 308 (S.D.N.Y. 2000) (in absence of affidavit based on personal knowledge, evidentiary hearing is unnecessary); United States v. Clement, No. 94 Cr. 928, 1995 WL 151786, at *2 (E.D.N.Y. March 29, 1995) (denying motion to suppress statements, where motion was unaccompanied by sworn affidavit); United States v. Burmby, No 92 Cr. 721, 1992 WL 373686, at *3 (E.D.N.Y. Nov. 30, 1992) (denying motion to suppress statements because unsupported by affidavit of personal knowledge).

## **CONCLUSION**

For the reasons set forth above, the government respectfully requests that the Court deny each of the defendants' motions.

Respectfully submitted,

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY

---

Todd Harrison
Assistant U.S. Attorney
(718) 254-7580