UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

 against                                                        CR-05-104(NG)

SHAHAWAR MATIN SIRAJ,
        Defendant

---

## MEMORANDUM OF LAW IN SUPPORT OF IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS POST-ARREST STATEMENT

MARTIN R. STOLAR
351 Broadway
New York, NY 10013
(212) 219-1919

KHURRUM B. WAHID
122 E. 42nd Street, Suite 1616
New York, NY 10168
(212) 661-5333

Attorneys for Defendant

## I. PRELIMINARY STATEMENT

In the fall of 2003 SHAHAWAR MATIN SIRAJ (hereafter MATIN) and another young man were approached by a government informant. The informant spent the next eight to nine months convincing these young men to commit crimes. On August 27th, 2004 MATIN was arrested and questioned. He was subsequently charged with four counts of conspiring to place an explosive device in a New York City subway. In July of 2004 MATIN moved to exclude post-arrest statements made on August 27th, 2004 as being violative of his Fifth and Sixth Amendment rights. On January 24th and 25th of 2006 a hearing was held to determine the factual basis for Defendant's motion to suppress post arrest statements.

The statements are a violation of MATIN's Sixth Amendment rights as he was already represented by an attorney on a pending criminal matter at the time of his questioning and he did not have the assistance of this counsel when considering the waiver of his rights. Further the statements are in violation of MATIN's rights as MATIN did request assistance prior to signing the Miranda waiver but was denied this assistance. Further, his execution of a written waiver of Miranda rights was not voluntary, knowing and intelligent because he was confused as to the role of the prosecutor and felt shocked and stressed by the events of the day. In addition, shortly before he signed the waiver, he was told by a law enforcement officer that he had to tell the truth to the lawyer, thereby vitiating any understanding of his right to remain silent.

## II. STATEMENT OF FACTS

On the morning of August 27, 2004 Detective Michael O'Brien, a member of the

Joint Terrorist Task Force, was called by his supervisor regarding an assignment (Transcript, pg 7, line 24). He was briefed on an ongoing investigation and told to go to Brooklyn, in the area of the 68th Precinct and locate a suspect (T 8, 18-21). The suspect was MATIN (T 9, 1-4). The NYPD had a 24 hour surveillance on MATIN and were following him from his residence in Queens to Brooklyn (T 9, 7-10). Detective O'Brien kept MATIN under surveillance for five hours that day (T 10, 5).

A Detective Torrano, from the 68th Precinct, called MATIN and asked him to come to the precinct regarding a pending state misdemeanor case he had issued MATIN a desk appearance ticket on because "it was good news, probably the case was being dismissed" (T 100, 1-3). MATIN contacted his attorney's office prior to going to the precinct (T 99, 20-24). His attorney, Mona Shah, had represented MATIN and his family on an immigration matter since MATIN's arrival from Pakistan in 1998 (T 67, 12-13). Ms. Shah also took on the role as attorney in the misdemeanor criminal matter as it had an impact on MATIN's immigration status (T 68-69, 25-2). Ms. Shah went to great lengths to deal try to resolve the criminal matter but was unsuccessful prior to MATIN's arrest on the present case (T 69, 12-25). Ms. Shah and her office were consulted by MATIN at every stage of the misdemeanor case (T 70, 11-15, T 72-73).

On August 27, 2004 Mrs. Shah's office advised MATIN just prior to heading to the 68th Precinct (T 70, 3-10). The advice was to go to the precinct and obtain the promised dismissal on the misdemeanor case (Id.). MATIN followed this advice in order to obtain the dismissal (T 99, 20-24). He was unable to go until about 3:00 pm that afternoon (T 100, 20-23).

3

A little before 3:00 pm that afternoon the Detective Murphy and Detective O'Brien saw MATIN walk from his place of work on Fifth Avenue heading northbound (T 11, 1-3). They pulled up in an unmarked police car and pulled their weapons on MATIN , told him not to move and to put his hands up (T 11, 14-19). He was informed only that he was being placed under arrest (T 11, 23-25). There was no arrest warrant for MATIN (T 25, 10-11).

Prior to being placed in the police car Detective O'Brien was asked by MATIN why he was under arrest (T 12, 11-20). He was told that the police could not talk to him and would not answer his concerns as to why he was being arrested (Id.). It was now 3:00 pm (T 13, 6). This discussion continued for the one hour drive to 290 Broadway (T 13, 9-17). MATIN was not advised of his Miranda rights in the car (T 23, 9-13). After MATIN was searched and prior to being placed in the police car he asked the officers "can I make a phone call, please let me make a phone call?" (T 103, 20-21). MATIN was "very shocked…stressed out" and "cannot speak. The bubble come in my throat. I was in shock over it." (T 104, 5-7).

MATIN testified that he had not been arrested on the misdemeanor case as he had not been handcuffed on that occasion (T 294, 14-17). Thus, August 27, 2004 was the first time MATIN had ever been arrested at gunpoint and handcuffed (T 106-107, 24-1). When MATIN asked about making a phone call he was told "when you reach there, then they will give you the phone." (T 106, 10-11). He immediately told the arresting officers that he was on his way to the 68th Precinct to deal with the assault case so why is he being arrested (T 107, 3-6). He testified that on many occasions throughout the afternoon and

4

evening he requested to call his parents (T 108, 18-22).  MATIN wanted to call his parents because he wanted to tell them to call his attorney Mona Shah (T 108, 1-6).

At 290 Broadway, MATIN was placed in a holding room (T 15,1-3).  He was then moved to the eighth floor and placed in another room (T 16, 14-17).  Finally he was moved to the ninth floor at approximately 6:20 pm (T 18, 18-21).  MATIN was handcuffed virtually the entire time up to his move into the room on the ninth floor (T 109-111).  Detective O'Brien claims the only statements by MATIN thus far were inquiries about the nature of his arrest, a request to use the bathroom, and a request for water even though MATIN was observing a religious fast that day (T 27, 2-7).  Detective O'Brien claimed that MATIN never requested a call to anyone, including to his parents (T 14, 14-25).  The Detective also claimed there were no discussions by MATIN about his pending misdemeanor case (T 30, 10-12).

MATIN was told when he gets upstairs to the ninth floor he better tell the truth (T 57, 1-3).  Once in the final interview room on the ninth floor Special Agent Robert Herrmann and others conducted the interview.  Also present in the interview were AUSA Todd Harrison, AUSA Kelley Currie, Detective Joe Nugent, and Special Agent Steve Andrews (T 39, 1-4).  The interview lasted approximately two hours (T 44, 20-21).

Agent Herrmann acknowledged there was video equipment in the room for playback purposes and the FBI has access to recording devices but the interview was not recorded (T 52, 8-21).  During the interview with MATIN, Special Agent Herrmann noted that MATIN was stating he did not commit the assault crime and that he was innocent (T 55, 5-11).

5

During the interview a Miranda rights waiver was provided to MATIN. This was provided to him in the midst of the conversation (T 115-116). MATIN testified "I didn't take a good look. I just wanted to sign it and I signed it in a hurry and I give it back to them." (T 116, 1-2). MATIN said he was orally told "you know your rights" (T 120, 21). At the time he signed the Miranda waiver he states "like my brain was not working. I was really in shock and confusion and I just took a pen and signed it." (T 116, 17-19). He states "I thought that I already got a lawyer because I was thinking that Mr. Todd Harrison is my lawyer at that point." (T 117, 3-6).

### III. ARGUMENT

A. PURSUANT TO THE 6TH AMENDMENT THE STATEMENTS MUST BE SUPPRESSED BECAUSE MATIN WAS ALREADY REPRESENTED BY COUNSEL.

MATIN's Sixth Amendment right to counsel vested when he was charged with a misdemeanor crime two months prior to the arrest in the present case. The Government cites the Davis rule requiring an unambiguous request for counsel so that a reasonable officer would understand that there is to be no questioning. Davis v. United States, 512 U.S. 452 (1994). This is not a case of vague requests for counsel. Law enforcement knew MATIN was represented by counsel on a criminal case at the time they questioned him. The officers knew MATIN had a misdemeanor assault charge pending and was represented in that matter. MATIN asserted his right to counsel in that misdemeanor case and as such the proper procedure would have been to contact his attorney prior to questioning. At no time did the agents attempt to speak to MATIN's attorney or inquire of him the name of his attorney.

MATIN did not initiate contact with the officers on August 27th, 2004 therefore any subsequent Miranda waiver must be seen as void if it is found he had already invoked his right to counsel. Edwards v. Arizona, 451 U.S. 477 (1981). In order to attempt to gain a waiver of MATIN's right to counsel law enforcement violated his Sixth Amendment right which had already attached. The "Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." Michigan v. Jackson, 475 U.S. 625, 632 (1986), citing Maine v. Moulton, 474 U.S. 159, 174 (1985).

It is undisputed that attorney Mona Shah represented MATIN in his misdemeanor case in Queens County court. MATIN's Sixth Amendment rights had attached when he was formally charged on the misdemeanor and had retained counsel in that matter. Arizona v. Roberson, 486 U.S. 675, 716 (1988). The Edwards rule extends to bar police-initiated interrogation following a suspect's request for counsel in the context of a separate investigation. Id.

MATIN had already expressed his desire to have legal advice prior to coming in contact with law enforcement. MATIN first contacted his attorney and sought her consult prior to going to the 68th precinct the afternoon he was arrested. It has long been held that "the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." Id, at 681. The Roberson court also found "if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own

7

instigation , is itself the product of the 'inherently compelling presures' and not the purely voluntary choice of the suspect." Id. The suspect in a new investigation can rely upon his previously retained counsel in determining whether to deal with law enforcement. Id.

There is clear evidence that law enforcement knew MATIN was represented in a criminal proceeding but it is not relevant to the legal analysis. Id, at 687. The law enforcement agents had the duty to determine if MATIN was represented by counsel. This was not done in the present case, likely because they already knew he was represented. To allow for the possibility that Detective Torrano called MATIN to the police precinct in order to lure him to a particular location for arrest and the interrogators were unaware of his pending State criminal case should be beyond question. "The Court should not condone unethical forms of trial preparation by prosecutors or their investigators." Patterson v. Ilinois, 487, U.S. 285, 278 (1988), Justice Stevens, Brennan, and Marshall dissenting.

There is a need to maintain a clear bright-line rule in matters concerning right to counsel and the interrogation of suspects. The Supreme Court found the need for a bright-line rule in Edwards: questioning must cease unless the suspect initiates the discussion. This rule was extended in Jackson holding no questioning can continue where a request for counsel after the Sixth Amendment right has attached. The rule was again extended in Roberson to cover questioning in a subsequent case when already represented in a previous case.

8

B. PURSUANT TO THE 5TH AMENDMENT THE STATEMENTS MUST BE SURPRESSED BECAUSE MATIN DID NOT PROVIDE AND KNOWING AND VOLUNTARY WAIVER OF HIS RIGHT TO COUNSEL.

There was no valid waiver of MATIN's right to counsel.  Only through a knowing and voluntary waiver of his Fifth and Sixth Amendment rights can MATIN have agreed to be questioned. See <u>Patterson</u> .  The Government devotes much of its argument to asserting MATIN did not comport with the requirements of <u>Edwards</u> by making a clear and unambiguous request for an attorney.  As stated previously there was no need to make such a request when MATIN already had an attorney representing him on a pending case

Further, MATIN's conduct shows he was seeking assistance in deciding whether or not to speak to law enforcement.  MATIN repeatedly asked to call his parents in order to reach out to his attorney and he did not execute the <u>Miranda</u> waiver understanding that he was giving up the right to have counsel during the questioning.  In fact he initially thought the prosecutor was his counsel.  The Government must show by a preponderance of the evidence that MATIN voluntarily, knowingly and intelligently waived his right to have counsel on his behalf present during his pre-indictment interrogation. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), <u>Lego v. Twomey</u>, 404 U.S. 447 (1972).

The factual evidence presented clearly showed MATIN requested his parents on a number of occasions beginning with the moment of his arrest.  His intention of asking for his parents was in order to have them contact his attorney with whom he had contact just prior to being arrested.  This fact shows MATIN was in fact someone who did seek the assistance of counsel when available.

The statements made to law enforcement on August 27, 2004 were involuntary. A confession will be found to be involuntary when it is obtained under circumstances that overbear the defendant's will. United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991). In evaluating the voluntariness of a confession, the Court must examine the totality of circumstances to determine whether the police officers' conduct involved duress or coercion such as to overpower the defendant's will. Schneckloth v. Bustamonte, 412 U.S. 218, 223-227, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); United States v. Kaba, 999 F.2d 47, 51 (2d Cir.), cert. denied 510 U.S. 1003, 126 L. Ed. 2d 476, 114 S. Ct. 577 (1993).

The totalities of the circumstances confirm MATIN did not knowingly waive his Miranda rights. In this case MATIN was asking for his parents from the moment he was arrested. He was arrested at gunpoint and told to remain silent but not told he would be afforded counsel. MATIN was taken to the FBI office and kept handcuffed in his chair for long periods at a time. In total he was placed in three different rooms over the course of approximately five hours. During this time he repeatedly asked for his parents in order to get word to his attorney that he had been arrested. When MATIN was finally asked to sign the Miranda waiver it was already after questioning had commenced. MATIN did not review the Miranda waiver document before signing it.

At the start of questioning and at the point when MATIN signed the Miranda document he was under the mistaken belief that AUSA Harrison was there to represent his interests as his attorney. He had been told by officers or agents that Mr. Harrison was an attorney and that Mr. Harrison would help him if MATIN would tell him the truth.

This command from law enforcement effectively vitiates any later administration of the <u>Miranda</u> warnings, or at best, left MATIN confused about what he had to do.

Further MATIN was unaware of what the term "prosecutor" meant. While the Government characterizes this fact as "patently false" it is very probable considering the circumstances (Gov. brief pg 18). MATIN made clear he had very limited experience with the American court system. The testimony indicated MATIN had been in the United States since 1998. The prosecution attempts to portray MATIN as knowledgeable about the role of a prosecutor because he was involved in an immigration proceeding and has a pending State court matter. According to the testimony in an immigration proceeding the Government is represented by a Trial Attorney and in the State court matter no prosecutor had ever been in contact directly with MATIN.

MATIN was told if he spoke to the prosecutor he would be allowed to call his parents. This promise was in fact kept when at the end of questioning Agent Hermann let him use a cell phone to make a two minute call to his parents. In that call MATIN in fact did tell his parents he had been arrested.

CONCLUSION

For all of the above reasons, the post-arrest statements should not be allowed into evidence on the prosecution's direct case.

Submitted by,

____/s/_____
 Martin R. Stolar
 Khurrum B. Wahid
 Attorneys for Shahawar Matin Siraj