**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**UNITED STATES OF AMERICA**

**OPINION AND ORDER**
-v-                                    05-CR-104 (NG)

**SHAHAWAR MATIN SIRAJ,**

       **Defendant.**
-------------------------------------------------------x
**GERSHON, United States District Judge:**

Defendant Shahawar Matin Siraj is charged with conspiracy to commit various offenses, arising from an alleged plot to bomb the New York City subway station at 34th Street in Manhattan. After he was arrested, defendant gave a statement to the government confessing to his role in the plot. On August 19, 2005, defendant moved to suppress his confession, arguing that it was obtained in violation of his rights under the Fifth and Sixth Amendments of the U.S. Constitution and under *Miranda v. Arizona*, 384 U.S. 436 (1966). A suppression hearing was held on January 24, and 25, and February 23, 2006. At the hearing, the government presented the testimony of Detective Michael O'Brien of the New York City Police Department and of Special Agent Robert L. Herrmann of the Federal Bureau of Investigation. Defendant presented his own testimony and that of Mona Shah, Esq. The following constitute my findings of fact and conclusions of law.

## I. FACTS

Defendant is an immigrant from Pakistan who, at the relevant time, was twenty-two years old[1] and lived with his parents in Queens, New York. On August 27, 2004, at approximately 3:00 p.m., in Bay Ridge, Brooklyn, defendant was walking from the Islamic bookstore where he worked

---

[1] Although defendant's age was not elicited at the hearing, it is undisputed that at the time he was arrested he was twenty-two years old.

to the 68th Precinct to obtain a document dismissing a pending state misdemeanor charge,[2] when he was arrested by NYPD Detectives Michael O'Brien and Robert Murphy. In executing the arrest, Detective O'Brien drew his weapon, pointed it at defendant, and told him not to move and to put his hands up. Defendant complied, and Detective Murphy searched and handcuffed defendant and informed him he was being placed under arrest.

Defendant testified that he was shocked and stressed that he was arrested because he believed that he was being arrested in connection with the state misdemeanor charge, and he was expecting to have that charge dropped. Detective O'Brien informed defendant that they could not talk to him regarding why he was being arrested. Defendant then asked to make a phone call. Detective O'Brien responded that defendant would be informed as to why he was being arrested, advised of his constitutional rights, and allowed to make a phone call, after they arrived at his office in Manhattan. During the approximately hour-long drive to the FBI office, defendant repeatedly asked why he was being arrested, and the detectives answered, in accordance with the instructions they had received from their supervisors, that they could not talk to him, but that someone would talk to him when they arrived at the office. The detectives did not advise defendant of his *Miranda* rights or ask him any questions at any time while transporting him to the office. However, defendant testified that he understood from the time of his arrest that he had the right to remain silent and that anything he said could be used against him. Defendant never asked to call a lawyer.

At approximately 4:00 p.m., they arrived at the FBI office, and defendant was placed in an

---

[2] Detective Torano from the 68th precinct had called defendant earlier in the day and had asked him to go to the precinct regarding a pending state misdemeanor charge for assault. Defendant had called Ms. Shah, who he understood to be representing him with respect to the state charge, and she had advised him that he could go to the precinct alone. In 2002, Ms. Shah had represented defendant and his parents in their application for asylum.

2

empty room on the ninth floor. Detective O'Brien gave defendant, who had been fasting, water and let him use the bathroom. Defendant's request to call his parents was refused. Approximately twenty minutes later, Detective O'Brien took him to another room on the eighth floor, where defendant remained seated for about two hours. Although defendant testified he had to wait thirty minutes to use the bathroom, the credible evidence established that, while on the eighth floor, Detective O'Brien again gave defendant water and took him to the bathroom. Defendant was handcuffed while in the eighth-floor room, but his handcuffs were loosened when he complained that they were too tight. Defendant periodically asked Detective O'Brien what was going on; and the detective responded that he could not talk to him about the case, but that someone would talk to him shortly.

Sometime around 4:30 p.m., Special Agent Herrmann and Detective Joseph Nugent of the NYPD went into the eighth-floor room and told defendant that he should not say anything and that he should just listen. Detective Nugent then told defendant, "you need to tell the truth." When defendant tried to interrupt him, Detective Nugent told him, "don't say anything, just think about it." Special Agent Herrmann and Detective Nugent then left the room. Defendant's requests to call his mother were again refused. He never asked to speak to a lawyer.

At approximately 6:20 p.m., Detective O'Brien moved defendant to a small interview room on the ninth floor. Approximately ten minutes later, defendant was moved to a larger room, where he sat at one end of a six-foot conference table in the middle of the room. Two Assistant United States Attorneys were on defendant's right-hand side, and at the opposite end of the table was Detective Steve Andrews, an NYPD intelligence detective. Also present in the room were Detective Nugent and Special Agent Herrmann. According to standard procedure, defendant was uncuffed

during the interview.

Before beginning the interview, the Assistants introduced themselves to defendant as "federal prosecutors from the United States Attorney's Office," and the detectives and the agent introduced themselves. Defendant's testimony that, upon being introduced to the Assistants, he believed one of the Assistants was his attorney is not credited.[3]

After the introductions were made, one of the Assistants told defendant that he had been arrested for his involvement in the subway bombing plot. When defendant tried to speak, the Assistant stopped him so that he could be read his rights. Special Agent Herrmann then told defendant, "[b]efore we ask you any questions, you must understand your rights," and he proceeded to advise defendant of his *Miranda* rights. The agent read defendant his rights verbatim from an FBI advice of rights form, which states:

> You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have a right to have a lawyer with you during questioning. If you cannot afford an attorney, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have

---

[3] Defendant testified that, at the time he was questioned, he did not know what a prosecutor was, but that he knew what a lawyer was, and, because the Assistant was introduced as a lawyer and one of the detectives told defendant that "[t]hey are going to help you if you say all the truth," he thought the Assistant was his lawyer. The circumstances and defendant's conduct belie this claim. At the time he was introduced to the Assistants, defendant was in a government office in which two detectives and the special agent were present. Defendant's own testimony established that no one ever told him that either one of the Assistants was his attorney. Defendant also testified that he understood Ms. Shah to be his attorney, and that the reason he wanted to call his mother was to tell her that he had been arrested and that he needed Ms. Shah. Additionally, defendant had filed two affidavits with the court in support of his motion to suppress and had never before claimed that he thought one of the Assistants was his lawyer. Finally, defendant was evasive and contradictory throughout his cross-examination. For all of these reasons, his claim that he believed one of the Assistants to be his lawyer was not credible.

4

the right to stop answering at any time.[4]

Special Agent Herrmann's notes on the advice of rights form indicate that he read defendant his rights at 6:27 p.m. As Special Agent Herrmann was reading defendant his *Miranda* rights, he was glancing up at defendant, and defendant was nodding as if he understood what the agent was saying. Special Agent Herrmann then asked defendant whether he understood his rights, and, as defendant himself testified, defendant replied that he did. Defendant specifically testified that he knew about his right to remain silent, and he knew what that right meant. Special Agent Herrmann then gave defendant the advice of rights form, told defendant to read it to himself, to take his time, and to feel free to ask any questions. Defendant looked over the form for a couple of minutes and said that he understood everything. Defendant testified that he had no problem reading English. Special Agent Herrmann asked defendant whether he had any questions, and defendant replied that he did not.

After Special Agent Herrmann had advised defendant of his *Miranda* rights, he directed defendant to read the last sentence on the form, which was the only sentence the agent had not read to defendant. That sentence reads: "I have read this statement of my rights and I understand what my rights are. At this time I am willing to answer questions without a lawyer present." Special Agent Herrmann asked defendant, "Do you understand what that means? Do you understand your rights that are above the sentence? And you agree to talk to us at this time without your lawyer present?" Defendant's testimony that, although he was given an opportunity to read the *Miranda* form, he did not look at it closely, is not credited. The credible testimony established that he was indeed given an opportunity to read the *Miranda* form, and it is undisputed that defendant signed

---

⁴ When testifying that he read defendant his rights, Special Agent Herrmann paraphrased what he read from the form. Although the agent's testimony of what he read to defendant differs slightly from what the form actually states, the difference is not material.

beneath the waiver clause. Indeed, defendant was eager to talk, and he never told any of the officers present that he wanted a lawyer or that he did not understand his *Miranda* rights.

After defendant was advised of his rights and signed the waiver form, he was interviewed by the Assistants for approximately two hours. Detective Nugent also asked a few questions. When defendant admittedly did not answer the government's questions truthfully, he was confronted with video and audio recordings, whereupon he gave truthful answers. While being questioned, defendant spoke fluent English. Defendant never indicated that he did not want to talk or that he had any trouble understanding what anyone was saying to him. During the course of the interview, no one ever yelled or raised his voice at defendant. In addition, there were a couple of breaks, and defendant was given water, allowed to use the bathroom, and offered donuts, coffee, and cigarettes.

Towards the end of the interview, at approximately 8:00 p.m., defendant again requested to call his parents. Special Agent Herrmann told defendant that the interview was almost over and that he would let defendant call soon. The interview resumed at about 8:15 p.m. and ended at about 8:30 p.m. When the interview ended, Special Agent Herrmann gave defendant his cell phone, and defendant spoke to his mother. Although defendant never told anyone the reason he wanted to call his mother, he testified that he had been trying to call his mother to get in touch with Ms. Shah.

## II.  DISCUSSION

Defendant moves to suppress his confession, arguing that it was obtained in violation of his rights under *Miranda* and of the Fifth and Sixth Amendments of the U.S. Constitution.

**A. Defendant's Fifth Amendment Right Against Self-Incrimination Was Not Violated Because He Was Advised of His *Miranda* Rights, He Did Not Invoke His Right to Counsel, and His *Miranda* Waiver Was Voluntary, Knowing, and Intelligent**

    1.    <u>Defendant was Advised of His *Miranda* Rights</u>

6

*Miranda* teaches that in all settings of custodial interrogations there must be procedural safeguards to protect an individual's Fifth Amendment right against self-incrimination. *Miranda,* 384 U.S. at 467, 478-79. Thus, when an individual is taken into custody, prior to any questioning, he must be warned that he has "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney[,] one will be appointed for him prior to any questioning . . . ." *Miranda*, 384 U.S. at 478-79. Any unwarned admissions made by an individual during a custodial interrogation must be suppressed. *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). Here, the government questioned defendant, and he confessed, only after he was advised of his rights under *Miranda*. Thus, defendant was afforded the procedural safeguards mandated by *Miranda*.

2. <u>Defendant Did Not Invoke His Right to Counsel</u>

After being advised of his rights under *Miranda*, if an individual asserts his right to counsel, the authorities must stop questioning until a lawyer is present or until the individual himself reinitiates conversation. *Edwards v. Arizona,* 451 U.S. 484-85 (1981). It is undisputed that defendant never once asked for a lawyer. Therefore, the government was not required to stop questioning defendant. Defendant's request to call his parents, which he claims was an effort to contact his attorney, was not an invocation of his right to counsel. To determine whether an individual has invoked his right to counsel, the court must conduct an objective inquiry into whether a reasonable officer under the circumstances would understand the defendant's statement to be a request for an attorney. *Davis v. United States*, 512 U.S. 452, 459 (1994). Where an individual "makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to

7

counsel[,]" the officers may continue questioning. *Id*. (emphasis added). Although defendant testified he wanted to call his parents so they could contact his attorney, he never communicated that he wanted a lawyer to any of the government officials.

Defendant's argument that he invoked his right to counsel because he called Ms. Shah prior to going to the 68th precinct and because the government knew he was represented by an attorney in a pending case is defeated by *Moran v. Burbine*, 475 U.S. 412 (1986). In *Moran*, the government knew that the defendant was represented by an attorney, and the attorney contacted the police in an attempt to talk to her client. 475 U.S. at 417. In holding that the defendant validly waived his *Miranda* rights, the Court in *Moran* noted that the defendant "at no point requested the presence of counsel, as was his right under *Miranda* to do." 475 U.S. at 423, n.1. The Court further noted that the Fifth Amendment requires only "that the police inform the suspect of his right to representation and honor his request that the interrogation cease until his attorney is present." There being no request for counsel by defendant in this case, I find that defendant did not invoke his right to counsel.[5]

3. Defendant's *Miranda* Waiver Was Knowing and Intelligent

Once an individual has been given his *Miranda* warnings, he may make a voluntary, knowing, and intelligent waiver of his right to remain silent or to an attorney. *Davis*, 512 U.S. at 458; *Miranda*, 384 U.S. at 479. To be valid, a "waiver must have been made with a full awareness

---

[5] Defendant's argument that he invoked his right to counsel because his Sixth Amendment right to counsel had attached in the state misdemeanor charge is without merit. As discussed below, defendant's Sixth Amendment right had not attached with respect to the federal conspiracy case; and the Supreme Court has rejected the argument that a defendant invokes his right to counsel under *Miranda* when his Sixth Amendment right has attached with respect to an unrelated offense. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).

8

of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421; *Lawrence v. Artuz*, 91 F. Supp. 2d 528 (E.D.N.Y. 2000). If the totality of the circumstances surrounding the interrogation reveals the defendant had the requisite level of comprehension, a court may properly conclude that the waiver was knowing and intelligent. *Moran*, 475 U.S. at 421;*United States v. Lynch*, 92 F.3d 62, 65 (2d Cir. 1996). In determining whether a waiver was knowing and intelligent, courts have focused on how the defendant was advised of his rights, whether he indicated he understood his rights, and generally whether the defendant was capable of comprehending his rights. *Lawrence*, 91 F. Supp. 2d at 536.

The credible testimony at the hearing established that defendant's waiver was knowing and intelligent. Not only did Special Agent Herrmann orally advise defendant of his *Miranda* rights, but defendant also read his rights from the advice of rights form. Defendant indicated that he understood his rights by nodding his head when the agent read them to him and, as defendant himself testified, he answered affirmatively when Special Agent Herrmann asked him whether he understood his rights. Although defendant was given an opportunity to ask questions regarding his rights, he indicated that he did not have any questions. Defendant specifically testified that he knew his right to remain silent, and he knew what that right meant. After Special Agent Herrmann read to defendant his rights and after defendant read the waiver clause on the form, defendant signed beneath the waiver clause. Based on the testimony at the suppression hearing, defendant is, and was at the time, fluent in English. The defendant specifically testified that he had no problem reading English. Thus, there were no language barriers preventing defendant from understanding his rights and the consequences of waiving them. Accordingly, I find that the government has met its burden of proving by a preponderance of the evidence that defendant knowingly and intelligently waived

9

his *Miranda* rights, i.e., that he was fully aware of both the nature of the rights being abandoned and the consequences of the decision to abandon them. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

Defendant's argument that, in denying his request to speak to his parents, the officers denied him the assistance he needed to make a knowing and intelligent waiver of his rights is contrary to the Supreme Court's decision in *Moran*. In addressing whether the defendant's comprehension of his rights was compromised by the police officers' failure to inform him that his attorney had called, the Court stated:

> [W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.

475 U.S. at 422-23 (internal citations omitted). Thus, that defendant did not have the benefit of talking to his parents before deciding to waive his rights is irrelevant once it is determined that his waiver was knowing and intelligent.

Finally, based on the testimony adduced at the suppression hearing, I reject defendant's claim that he lacked the comprehension to knowingly and intelligently waive his rights. As explained above, defendant gave all the indications that he understood his rights and the consequences of waiving them. He gave the government a detailed statement. At the suppression hearing, defendant was voluble on direct and cross-examination. Indeed, when his attorney made speaking objections to questions put to him on cross-examination, he was able to discern from his attorney's objection how he should answer the question before him. These are not characteristics of one who lacks

comprehension.[6]

    4.    <u>Defendant Voluntarily Waived His *Miranda* Rights</u>

In addition to being knowing and intelligent, a defendant's waiver of his rights under *Miranda* must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. When determining whether a defendant's waiver was voluntary, courts look to the same factors considered in determining whether a defendant's confession was voluntary under the Due Process Clause. *See, e.g., United States v. Male Juvenile*, 121 F.3d 34 (2d Cir. 1997); *United States v. Miller,* 382 F. Supp. 2d 350, 370 (N.D.N.Y. 2005); *United States v. Egipciaco*, 389 F. Supp. 2d 520 (S.D.N.Y. 2005). Accordingly, since defendant waived his rights under the same conditions and almost at the same time he confessed, I find that defendant's waiver was voluntary for the same reasons I find below that his confession was voluntary under the Due Process Clause.

**B.    Defendant's Right to Due Process Under the Fifth Amendment Was Not Violated Because His Confession Was Voluntary**

Involuntary confessions are inadmissable at trial as a violation of the Due Process Clause. *Arizona v. Fulminante*, 499 U.S. 279 (1991); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *Spano v. New York*, 360 U.S. 315, 320 (1959). To determine whether a defendant's confession was

---

[6]    Defendant also argues that, in analyzing whether his *Miranda* waiver was knowing and intelligent, this court should apply the same standard the court applied with respect to defendant's waiver under *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), i.e., that an attorney must explain to a defendant his rights and the significance of each one before the defendant can waive his right to conflict free representation. Defendant confuses the rights at issue and his rights under *Curcio*. A *Curcio* waiver involves a defendant's Sixth Amendment right to counsel, and a *Miranda* waiver involves a defendant's Fifth Amendment right against self-incrimination. There are distinct standards articulated in the Supreme Court's jurisprudence governing each of these waiver issues. Here, I apply the appropriate standard, and I reject defendant's suggestion that one be substituted for the other.

involuntary, a court must look at whether, under the totality of circumstances, the subject's will was overborne by the government in such a way as to render his confession the product of coercion. *Fulminante*, 499 U.S. at 288; *Schneckloth*, 412 U.S. at 226; *Davis v. North Carolina*, 384 U.S. 737, 742, 752 (1966). This analysis requires assessing the characteristics of the defendant, the details of the interrogation, and the conduct of the officers. *See Fulminante*, 499 U.S. at 287-88; *Schneckloth*, 412 U.S. at 226; *Davis*, 384 U.S. 740-47.

The credible testimony established that, under the totality of the circumstances, defendant's confession was voluntary. Defendant did not suffer any physical deprivations. When defendant was taken to the FBI office, he was given water and allowed to use the bathroom several times. During the course of the interview, there were a couple of breaks and defendant was given water, allowed to use the bathroom, and offered donuts, coffee, and cigarettes. Even though defendant was handcuffed, his handcuffs were loosened when he complained they were too tight. Defendant was not held or questioned for an excessively long time; he was transported for one hour, held for two hours, and then questioned for two hours. There was no coercive police presence when defendant gave his confession. There were only two detectives and one agent in the room, along with the two prosecutors, and they were physically distanced from defendant. While the two prosecutors sat next to defendant, one detective sat at the opposite end of a six-foot table, and the other two, one agent and one detective, were standing. In addition, there is nothing about the location in which defendant was held and questioned to suggest that his confession was involuntary.

There are no facts to suggest that defendant was physically or otherwise coerced into confessing. *See Connelly*, 479 U.S. at 167, 170 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause.").

There are no allegations that the agent and detectives exerted physical force or made threats of physical force. No one ever yelled or raised his voice at defendant. Although defendant points to the fact that, in executing the arrest, Detective O'Brien drew his weapon, pointed it at defendant, and told him not to move and to put his hands up, such claims do not rise to the level of the physical coercion required to render a confession or waiver involuntary. *See Egipciaco*, 389 F. Supp. 2d at 525 (holding that the defendant's confession was voluntary even though the officers used force in arresting the defendant). As Detective O'Brien testified, not only were those actions justified by the nature of the case, but once defendant complied with their demands, no weapon was pointed at him. Furthermore, the show of force defendant complains of was approximately three hours before he confessed.

Defendant argues that he was coerced because the detectives told him he had to tell the truth. However, defendant's argument is contrary to his conduct when he was being interviewed on August 27, 2004. It is obvious defendant did not feel pressured to tell the government the truth because, as he admits, he repeatedly lied when he was interviewed and only told the truth when confronted with audio and video recordings contrary to his previous answers. In any event, Detective Nugent's statement to defendant is not sufficient to render defendant's confession (or *Miranda* waiver) involuntary. *See Egipciaco*, 389 F. Supp. 2d at 526 (concluding that a defendant's confession was not involuntary when the officers told him that cooperating would be the only way to reduce his sentence if he lost at trial). Defendant claims he was "shocked and stressed" when he waived his *Miranda* rights and confessed. While this factor is relevant to the court's determination, absent any police coercion, under the totality of the circumstances, this factor alone is not enough to render defendant's confession involuntary. *See Bruno v. Cunningham,* No. 03 Civ. 937, 2004 WL

2290503, at *11 (S.D.N.Y. October 8, 2004). In sum, the government has met its burden of proving by a preponderance of the evidence that defendant's confession was voluntary.

C.  **Defendant's Sixth Amendment Right to Counsel Was Not Violated Because it Did Not Attach on the Federal Conspiracy Case**

Defendant argues that his Sixth Amendment right to counsel was violated because it had attached with respect to the state misdemeanor charge and because the government knew he was represented by counsel on that charge at the time they questioned him, but they did not contact his attorney prior to questioning, or ask him for his attorney's name.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST., amend. VI. The Sixth Amendment right to counsel attaches when the adversarial process has been initiated against a defendant "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *Texas v. Cobb*, 532 U.S. 162 (2001). Once the Sixth Amendment right to counsel has attached, "any subsequent waiver during a police-initiated custodial interview is ineffective." *McNeil*, 501 U.S. at 175. However, the Sixth Amendment right to counsel is offense specific. *Id.* That is, while a defendant may have a Sixth Amendment right to counsel in a case where the adversarial process has been initiated against him, that right does not attach in an unrelated case in which the adversarial process has not been initiated. Thus, any statements regarding other offenses as to which the Sixth Amendment right has not attached are admissible. *Id.* at 176.

In the present case, when defendant was questioned by the government, while he had been charged with a state misdemeanor offense, he had not been charged with any crime having to do

14

with conspiring to place an explosive device in the 34th Street subway station. It is undisputed that the state misdemeanor charge is unrelated to the federal conspiracy case. Thus, I find that defendant's Sixth Amendment right to counsel had not attached with respect to this federal conspiracy case, and his Sixth Amendment right was not violated when he was questioned regarding it.

Defendant's reliance on *Arizona v. Roberson*, 486 U.S. 675, for his argument that under the Sixth Amendment the government was barred from questioning him on the federal conspiracy case is misplaced. *Roberson* discussed the defendant's rights under the Fifth Amendment. Unlike the Sixth Amendment right to counsel, when a defendant invokes his right to counsel under *Miranda* as a procedural safeguard of his Fifth Amendment right against self-incrimination, such a right is not offense specific. Thus, once a defendant has invoked his right to counsel under the Fifth Amendment, he may not be questioned regarding ANY offense unless his counsel is present. *McNeil*, 501 U.S. at 177. Having concluded that defendant did not invoke his right to counsel under *Miranda*, the rule articulated in *Roberson* is inapplicable to the facts in this case.

### III. CONCLUSION

For the foregoing reasons, defendant's motion to suppress his confession is denied.

SO ORDERED.

_____/s/_____
**NINA GERSHON**
**United States District Judge**

Dated: March 29, 2006
Brooklyn, New York