UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA, : CR 05-104

:

-against- :

United States Courthouse
Brooklyn, New York

SIRAJ SHAHAWAR MATIN, :

February 15, 2006
2:30 o'clock p.m.

Defendant. :

- - - - - - - - - - - - X

TRANSCRIPT OF CONFERENCE
BEFORE THE HONORABLE NINA GERSHON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: ROSLYNN R. MAUSKOPF
United States Attorney
BY: TODD HARRISON
Assistant United States Attorney
One Pierrepont Plaza
Brooklyn, New York

For the Defendant: MARTIN R. STOLAR, ESQ.

Court Reporter: Gene Rudolph
225 Cadman Plaza East
Brooklyn, New York
(718) 260-2538

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

THE CLERK: Criminal cause for status conference, United States versus Matin.

May I have the appearances, please?

MR. HARRISON: Todd Harrison for the United States.

Good afternoon, Your Honor.

MR. STOLAR: For the defendant, Martin R. Stolar.

Mr. Wahid is not available to be here today, Judge.

THE COURT: All right. Counsel, there are a number of issues to take up today but the first thing we need to take up, I believe, is the issue of a conflict. I understand from your letter, Mr. Stolar, that you have advised the defendant of what the issue is and you have given him a copy of the transcript of the suppression hearing, at least those portions that relate to the issue.

MR. STOLAR: Essentially the bench conference.

THE COURT: All right. Then I am going to be addressing myself now to you directly, Mr. Matin. I am going to be making a lot of statements to you. I am not going to be asking you a lot of questions today. I want you to have time to think about these issues and then we will put this on again for approximately a week from now, after you have had a chance to think about the issues, and then I will be asking you some questions.

MR. STOLAR: Judge Gershon, apparently Mr. Ken Paul, who has been asked to be Curcio counsel, is present in the

courtroom.

THE COURT: Yes, I am aware of that.

MR. STOLAR: Okay.

THE COURT: Mr. Matin, I want to advise you today of an issue that has come up that suggests a potential conflict of interest between you and your attorneys, Mr. Stolar and Mr. Wahid. I am going to, as I said, next time ask you some questions about this because I am going to need to find out what it is that you wish to do about it. That is because you are not permitted to proceed with lawyers with whom you may have a conflict unless you waive, which is to say, give up, your right to have a lawyer who has absolutely no conflict of interest with you.

To begin with, I want to be sure that you understand that you have the right to an absolutely conflict-free attorney. In other words, you have the right to an attorney who has only one interest, and that is, to represent your interests. Of course, if you could not afford to hire an attorney, the Court would appoint an attorney for you.

A lawyer with no conflicts is one who can give you advice and present your defense with no concerns other than you and your interests.

Let me tell you about the conflict that is potentially in this case, insofar as I understand it.

At the suppression hearing you testified that you

had told Mr. Stolar that you had thought that the prosecutor, Mr. Harrison, was your attorney when you made your statements to Mr. Harrison; the statements, that is, that were the subject of the suppression hearing. This raises the possibility that Mr. Stolar could be called as a witness to testify as to whether you made those statements to him; that is, Mr. Stolar may be an important witness for you both at the suppression hearing and at the trial regarding what was or was not put into your affidavit.

THE DEFENDANT: I understand.

THE COURT: Do you understand what I am saying?

THE DEFENDANT: Yes, Your Honor.

THE COURT: The ethics rules for lawyers, that is, the rules under which all lawyers must operate, provide that a lawyer cannot be a witness on an important issue for his client. Because of that, your lawyers are prevented from pursuing a strategy of calling Mr. Stolar as a witness; that is, your current lawyers are.

Since there is an ethical prohibition on them calling Mr. Stolar, they cannot be objective judges of whether calling Mr. Stolar would be a good or wise strategy for you to follow. For this reason, if you wish to continue to use Mr. Stolar and Mr. Wahid as your attorneys, I must ask you, not today, but later, to waive or give up your right to have conflict-free attorneys representing you. Otherwise, I am

required to disqualify them as your attorneys.

In other words, you have two options. First, if you wish to call Mr. Stolar as a witness, you could hire or the Court could appoint, if you couldn't afford your own attorney, another lawyer to defend you. Then, with Mr. Stolar no longer representing you, that new lawyer could call Mr. Stolar as a witness. The suppression hearing could be reopened for that testimony.

If Mr. Stolar were called as a witness, he would be required to testify, even if he preferred not to testify, unless there were some legal basis that would allow him not to testify; that is, even if the lawyer says he doesn't want to testify, as Mr. Stolar indicated at the hearing, if he is no longer your lawyer, he can be compelled to testify.

Your second option, in order for you to continue having Mr. Stolar represent you, is that you waive or give up your right to call him as a witness on your behalf. Please understand that the fact that you have another lawyer, Mr. Wahid, as well as Mr. Stolar, doesn't change this. Mr. Wahid cannot call Mr. Stolar as a witness as long as Mr. Stolar is also representing you, nor can you just hire another lawyer to call Mr. Stolar as a witness and then afterwards that you continue with Mr. Stolar as your lawyer. It doesn't work that way.

So long as Mr. Stolar is representing you, he

cannot be a witness, either sworn or unsworn -- and I will explain that in a moment -- who could be called by you as a witness to testify as to what you told him.

Put another way, if Mr. Stolar is called as a witness, he will be disqualified from representing you.

Now let me describe for you what I have referred to as an "unsworn witness." Mr. Stolar not only cannot testify on your behalf if he is your attorney but also he can't ask you a question such as, quote, didn't you tell me that you believed the attorney for the government was your attorney, close quote. That is, he will not be able to say or even imply through a question that he has knowledge on this issue.

I want you to understand the effects of a waiver, that is, a waiver that you are considering. A waiver is final. It exists throughout the trial and any later court proceedings, such as an appeal. You are not permitted to change your mind. You will not be permitted to argue later, if you are convicted, that you did not really understand the waiver or the issue. You will not be permitted to argue that Mr. Stolar did not do a good job for you because of a conflict of interest.

That is what the waiver is. You give up your right to have Mr. Stolar testify on your behalf and you give up your right to complain about any conflict of interest.

You will also be giving up your right to the

effective assistance of counsel insofar as you might otherwise claim that Mr. Stolar should have put something in the affidavit which he did not put in. I cannot permit you to continue with Mr. Stolar as your attorney unless you were to waive your right to make such a claim, and that is because we don't want to go through a whole trial and then at the end you make a claim that might require us to start over.

I must also tell you that at this time it is not possible for me to know, to predict, all possible issues relating to this situation or how important the possible conflict might be to your case, either at the suppression hearing or at the trial. I couldn't possibly spell out all the possible problems that the potential conflict raises.

At the hearing, Mr. Stolar and Mr. Wahid indicated a willingness to withdraw certain issues to avoid a potential conflict regarding Mr. Stolar's possible testimony, but it is you who have the right to call Mr. Stolar as a witness.

I want you to understand that nothing that I am saying here today is meant in any way to criticize your current attorneys. I simply want you to understand what your rights are.

I have just given you a lot of information. You have been shaking your head "yes" as I speak.

THE DEFENDANT: Yes. Yes, Your Honor.

THE COURT: I assume it is indicating that you

understand what I have been saying.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Nonetheless, I want you to have time to fully absorb what I am saying and to think about it and also to talk to your lawyers about it and be aware that when I ask you about it next week, I am not going to be asking you just yes or no questions. I will ask you to explain in your own words what you understand the conflict to be, assuming that you want to waive it, so that I am sure that you understand it.

THE DEFENDANT: Yes.

THE COURT: In addition, I highly recommend to you that you discuss this entire issue with an attorney independent of Mr. Stolar. Since Mr. Wahid has been working with Mr. Stolar and he himself expressed at the hearing a willingness to forego a line of questioning in order to avoid the issue of Mr. Stolar testifying, I urge you further to consult with a lawyer who is independent of Mr. Wahid.

Remember, it is not up to Mr. Stolar or Mr. Wahid whether to limit the evidence on your behalf to avoid Mr. Stolar becoming a witness. It is up to you. They may not be able to give you the unconflicted advice that you are entitled to. Therefore, you should have a lawyer who has no interest other than consulting with you about this particular issue.

You, of course, are free to retain someone of your own choosing to consult with about this. However, if you would like me to appoint someone from our Criminal Justice Act panel to be your consulting attorney, I am going to do that. I have in fact asked a member of the panel to be present here today, and he is here. If you wish to speak to him, his role will be solely to help you to understand the issue and to advise you as you decide whether or not you wish to waive your rights regarding the possible conflict of Mr. Stolar or whether you wish to hire or have me appoint a different attorney to take over your defense in this criminal case.

Now, the Criminal Justice Act lawyer who I have asked to appear here would never be appointed to represent you at the trial. He has one role and one role only, which is to assist you in making your decision. I make the rule in advance that you couldn't simply choose to have him as your attorney because I want to avoid any conflict there might be with the consulting attorney. So the consulting attorney would be just for that purpose.

Have you understood up to now?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Very good.

Would you like me to appoint a lawyer now? I can introduce him to you now, if you would like to do that.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Very good.

Mr. Paul, would you come forward, please?

(Kenneth Paul steps forward.)

THE COURT: All right. This is Mr. Kenneth Paul.

Do you have a card that you can give to the defendant.

MR. PAUL: I do, Your Honor.

THE COURT: All right. If possible, if you can meet with the defendant very soon to discuss this matter and anything -- I think we should have a copy of the transcript of the suppression hearing made available.

MR. STOLAR: I can do that.

THE COURT: Can you do that, Mr. Stolar?

MR. STOLAR: Yes.

THE COURT: Okay. That is fine.

I am trying to think if there is anything else other than --

MR. PAUL: If the marshals could keep him present today, I will go down and speak to him today.

THE COURT: You can speak with him today? That would be excellent.

MR. PAUL: Yes.

THE COURT: Okay. Marshal, can you do that, keep Mr. Matin here?

THE MARSHAL: Yes, ma'am.

THE COURT: For the afternoon.

All right. That will be excellent. We will have some other proceedings going on here now for a while, but after that, then you can visit him downstairs.

MR. PAUL: Okay.

MR. STOLAR: Do you want to pick a date now while Mr. Paul is present?

THE COURT: Yes.

MR. HARRISON: Just for the record, I think Mr. Paul, if he hasn't, we can correct that, I think he's gotten copies of my motion related to this issue and Mr. Stolar's response.

MR. PAUL: I have glanced at it. I haven't received it but have looked through it.

MR. STOLAR: What I will do is, Mr. Paul's office is not very distant from mine. I will make copies of Mr. Harrison's motion, my responses and a copy of the suppression hearing transcript for Mr. Paul and he can pick them up from me.

THE COURT: All right. Very good.

If there is anything else that you need from the Court file, you can contact Victor Joe, my deputy, and get it from him.

MR. PAUL: I will do that.

THE COURT: Okay. I appreciate your being here.

Now, let's see. Next week?

MR. STOLAR: Next week Wednesday, Thursday and Friday are open.

THE COURT: All right. How about exactly a week from today? I do have a proceeding at 2:30. We can make it 3:00 o'clock.

MR. STOLAR: Could we avoid Thursday?

THE COURT: Yes. We will make it a week from today, Wednesday, the 22nd.

MR. STOLAR: At what time?

THE COURT: 3:00 o'clock.

MR. STOLAR: Okay.

THE COURT: Let me just see. I do have something at 3:00 o'clock.

Let's do it at 10:30. We will do it at 10:30. We have one short matter at 10:30.

Can you do 10:30 on Wednesday.

MR. STOLAR: Okay.

MR. PAUL: The 22nd.

THE COURT: All right. Very good.

We do have a few other matters that I think we can take up.

MR. PAUL: I will wait until the proceedings are done. Then I will meet with the defendant.

THE COURT: Very good. Thank you.

MR. STOLAR: If I may?

THE COURT: Yes.

MR. STOLAR: The first, Judge, is the -- the memorandum of the defense on the suppression question. I got from Mr. Wahid, who is the initial drafter of our memorandum, by e-mail today a copy of it and it needs work. So I would like your permission to put it in on Friday.

THE COURT: Absolutely.

The hearing is going to be reopened on the government's behalf, if not also on the defendant's behalf.

MR. STOLAR: That's the next question.

THE COURT: If you want to put in your brief on Friday.

MR. STOLAR: Mr. Harrison got two business days of an adjournment and which is --

THE COURT: No. I have no problem. I am just saying, if there is new counsel, if that should happen, then we would have an additional schedule here.

MR. STOLAR: Right. Okay.

THE COURT: There were some questions, and we are not at that stage where we have the reopening of the suppression hearing. But there were just a couple of things that I think maybe we can dispose of now.

The government had requested that I direct that the defendant not be permitted to confer with his counsel

regarding his testimony when called by the government.

That application is denied pursuant to a case right on point, which is Supreme Court, Geders versus the United States, 425 US 80, 1976 decision. I am not aware of any authority that alters that position.

Another issue that we had was really the issue of Mr. Harrison as a potential, or acting as an unsworn witness, and I was thinking when the suppression hearing is reopened, maybe we need to practice either by having another attorney doing the questioning on behalf of the government or limiting the questions so that it is clear that the questions, that it is not Mr. Harrison presenting himself. This is not a matter, so the defendant understands, of disqualification but, rather, of protection of the defendant, so when this case goes before a jury, the jury isn't evaluating your credibility against the prosecutor's.

So that when you answer questions, if Mr. Harrison is prosecuting the case, the defendant should be cautioned to refer to the "government lawyer" as opposed to "Mr. Harrison" and, Mr. Harrison, you will have to decide how you are going to handle that, either whether someone else is going to ask the questions or that you ask the questions, "Didn't you say to the attorney for the government."

MR. HARRISON: Yes, Judge.

THE COURT: This is going to have to be explained to

the defendant for his own protection prior to the trial.

As I say, I think when we reopen the suppression hearing, it may be useful, as I say, for practice before the jury that it be done in that way at the suppression hearing.

MR. HARRISON: Yes, Judge.

THE COURT: There was another issue that you raised, Mr. Harrison, suggesting that counsel could not introduce the defendant's letter, the letter that was given to you as 3500 material, and I didn't see why that was a problem.

MR. HARRISON: I think -- I think Your Honor is -- Your Honor addressed the issue correctly. That was really in relation to the potential unsworn witness problem with Mr. Stolar. But Your Honor has taken care of that. So if they wanted to introduce the letter, I think they could.

THE COURT: The letter is the defendant's letter.

MR. HARRISON: Yes.

THE COURT: It is not vouching by the lawyer.

MR. STOLAR: Correct.

MR. HARRISON: Yes. I think that would be correct, as long as there was no reference to the fact that Mr. Stolar got it or vouched for the letter or anything.

THE COURT: He can't vouch for the letter. He didn't write it.

MR. HARRISON: Yes.

MR. STOLAR: I guess I could vouch for the fact that

I received it. If I have to show it to the witness, I don't think that's a problem, did you write this letter? Yes.

MR. HARRISON: Exactly, Judge.

THE COURT: All right. Did you want to speak to your attorney right now?

THE DEFENDANT: Yes.

THE COURT: Go ahead.

(Pause.)

MR. STOLAR: If I may, Judge, before we leave this subject, there is one other issue.

THE COURT: Yes.

MR. STOLAR: That is, Mr. Harrison's request that the hearing be reopened based on the -- his receiving the -- a copy of the letter that my client wrote to me. I do ask for an offer of proof as to what exactly we would reopen the hearing for with respect to his receiving that one piece of 3500 material.

MR. HARRISON: I can get into specifics, Judge, maybe at the end of the conference, after the witness has been removed. But suffice it to say --

THE COURT: It is the defendant. We can't remove him.

MR. HARRISON: Well, in terms of asking me for a proffer as to what I am going to cross-examine --

THE COURT: I don't think you have to tell me every

single question that you are going to ask.

MR. HARRISON: Sure.

Suffice it to say, the letter tells a different story than what he put in his affidavit and a different story than what he said at the suppression hearing. I really don't anticipate being that long. I am going to focus my questions solely on that letter and I don't think I will have more than ten or fifteen minutes of questioning, at most.

MR. STOLAR: The letter basically says there is a mistake in the affidavit that says I went to the precinct from my home. I didn't go from my home. I went from the shop. The store, the bookstore. That's what the letter says to me. It doesn't cover any other subject.

THE COURT: I assume that Mr. Harrison is entitled to elicit that it doesn't cover any other subject.

MR. HARRISON: That's right, Judge.

MR. STOLAR: Fine.

THE COURT: All right.

MR. STOLAR: Do you want to do this next Wednesday or are we going to set another date to reopen?

THE COURT: No. I think we need to find out first what the defendant's wishes are with respect to counsel.

MR. STOLAR: Okay.

THE COURT: Actually, I would not have time then to continue the hearing right at that moment. I would have to

put it over to the next day or two.

Okay. Mr. Harrison, since you have indicated you won't be available during March, I am going to ask that you give me your requests to charge by the end of February.

MR. HARRISON: Okay, Judge.

THE COURT: All right. I realize it is well in advance of the date of the trial, but these are not common charges. I would like to have that.

MR. STOLAR: We have a couple of counts in the indictment I think that the charge books have not made up a charge for yet.

THE COURT: I don't know if there is anything in particular the defense is intending to put forward on this, in any event.

MR. STOLAR: I will see what the government puts in. Then we will make a decision.

THE COURT: All right. We can discuss a date later.

We did have one setback with regard to scheduling. I think we can take care of that, which is the actual scheduling of the trial date of the trial.

I want to ask for about two hundred or two hundred fifty jurors. The only place or the most convenient place to do that would be in our old ceremonial courtroom.

MR. STOLAR: Right.

THE COURT: But, unfortunately, another judge has

already scheduled a large jury selection for that date.

What I would like to do is schedule the jury selection for April 17th, the week before. I was trying to think as to why we hadn't done that earlier, whether someone had a conflict. I believe it was Mr. Harrison just getting back.

MR. HARRISON: That's right, Judge.

THE COURT: I think we can do the jury selection on the 17th and then we could do the trial on the 24th --

MR. HARRISON: Okay, Judge. That's fine.

THE COURT: -- as planned.

All right. So even if we have the jury well before then, we won't start the trial until the 24th.

MR. STOLAR: So we are now --

THE COURT: Jury selection on the 17th of April. I will just ask my clerk to notify the jury administrator to reserve that. She has indicated that that room will be available that week.

MR. STOLAR: Then we would move up the production of the 3500 material to hopefully the Friday before then because we were going to do it on the Friday before the 24th.

MR. HARRISON: Judge, I would like to keep it where it is. We are not starting the trial still until the 24th. If we wanted to move it up a day or something, that would be fine.

THE COURT: Let's move it up to, say, Wednesday of that week during the jury selection.

We also had some issues regarding the questionnaire and, again, subject to revisiting this if there is a change of counsel, there is nothing that I am aware of in a potential conflict that would affect this as of today. It is always subject to being revisited. I think we might save some time if we go over some of this now.

What I am looking for is to try to resolve some of the disputes. Mr. Harrison, I haven't heard from you other than Mr. Stolar identifying the objections that he understands you have made to the revised questionnaire.

MR. HARRISON: That's right, Judge. I thought we were going to discuss them today. If that's okay?

THE COURT: Yes. That's fine.

The first item was the second line of the introductory phrase, you objected to the phrase, "A Muslim immigrant from Pakistan."

MR. HARRISON: Yes, Judge.

THE COURT: What is the objection?

MR. HARRISON: It seems like -- it is pretty clear it will be part of the defense strategy to gain sympathy from the jury by repeatedly referring to the defendant as an immigrant, as a Muslim, someone from Pakistan. I really don't see the relevance. The case is going to be about whether or

not this defendant was in a conspiracy to place bombs in the subway. It is not relevant that he is an immigrant. It is not really relevant, frankly, that he is from Pakistan. If we had someone on trial who was Catholic, we wouldn't be asking -- we wouldn't put in the introduction "Todd Harrison as a Catholic." It doesn't have any relevance to it. We wouldn't put in that someone else was an immigrant. We don't put in generally in jury questionnaires what country people are from. It doesn't have any relevance to this particular case.

THE COURT: Except that in this case what we are looking for in terms of potential prejudice is any bias against the defendant.

MR. HARRISON: But that can --

THE COURT: Or possible sympathy for the defendant for those reasons. But it seems to me perfectly neutral and it makes it clear to the jurors why it is we are asking the questions. I don't see how the government is prejudiced by having that phrase.

MR. HARRISON: If Your Honor wanted to ask a question in the body of the questionnaire or in your oral questioning some -- a couple of basic questions. Do you have any prejudice against Muslims? Do you have any prejudice against immigrants? That's fine.

But this questionnaire repeatedly, as the defense

has made out the questionnaire, repeatedly refers throughout the body of it to the fact that the defendant is a Muslim immigrant from Pakistan. If we want to ask one or two questions about that, that's fine. To continue -- continually bringing it up as a description of the defendant is not relevant and simply --

THE COURT: You don't have any objection to my describing the defendant in that way at the point when I am asking the questions. How about Pakistan and Islam?

MR. HARRISON: That's fine. If in the body of the questions you wanted to ask simply, the defendant is Muslim. Does anyone have any prejudices against Muslims? The defendant is from Pakistan. Does anyone have any prejudices against anyone from Pakistan? That's fine.

MR. STOLAR: The whole --

MR. HARRISON: The immigrant aspect, I don't see it has any relevance to anything that is going to go on in the trial. If we were going -- for some reason if we are going to put that in there, we should describe it correctly and say "is an illegal immigrant."

MR. STOLAR: At the time he was arrested he was not an illegal immigrant. He had a pending, pending political asylum question. He was lawfully in the country.

My point, Judge, is that the issues in this case in the political context in which we live now are such that I

would like honest answers from people and if they are in a courtroom packed with other people and you say, "do you have any prejudices against Muslims," in this day and age they will look over their shoulders and say no. But in the privacy of a written questionnaire they are free to say yes, I don't think I am proper on this case. That's why I want the question there.

MR. HARRISON: Fine. I am not objecting to asking the question, do you have any prejudices against Muslims.

THE COURT: I have heard enough. I will decide. You will get a copy of the questionnaire well in advance.

All right. In the same paragraph, the government has objected to the phrase, "The defendant is presumed to be innocent." I will be going into all of these legal principles at another time. I think I should just change that sentence to, "The defendant has pled not guilty."

MR. HARRISON: That's fine, Judge.

THE COURT: Any objection to that?

MR. STOLAR: No. I can live with that.

THE COURT: All right. Now, the third is the word "difficult" versus the word "impossible." Counsel, I am going to be reframing those questions in the way I typically ask the questions, such as, is there anything about your views of Muslims or the faith of Islam that would affect your ability to be fair in this case. I will do the same thing on all of

those questions.

MR. STOLAR: Okay.

MR. HARRISON: That's fine, Judge.

THE COURT: The next group of questions has to do with the subway searches. Mr. Stolar, why don't you tell me why you think those questions are relevant.

MR. STOLAR: It has to do with the experiences of jurors who are being asked to sit on a case where the defendant is charged with conspiracy to blow up the New York City subway system and the security measures that the New York Police Department has taken to try to prevent something from taking place as the defendant is accused of doing. So that the experience of a juror with the particular technique that has been developed by NYPD to deter such conduct I think becomes relevant to their ability to sit and -- on this gentleman's case.

THE COURT: In what way?

MR. STOLAR: If somebody says that the subway search policy is absolutely necessary to deter terrorism, I am glad that it is there and if it had been in place, then this fellow never would have been able to do what he was planning to do, then I don't think that person is an appropriate juror for the case.

On the other hand, if somebody --

THE COURT: Someone who favors subway searches isn't

an appropriate juror?

MR. STOLAR: No. If they go to the point of saying, boy, if there had been subway searches in place back in August of 2004, then this plot never would have gotten any place. The plot never would have gotten any place anyway. It just comes out to their reactions as to how they feel about the subway system and I am curious to know how people feel about the subway system and the role of the New York City Police Department in conducting these subway searches and whether or not their awareness or feeling about them would make it difficult for them to be a fair juror in the case.

MR. HARRISON: I just think it's going a little far afield, Judge. As Mr. Stolar indicated, actually it doesn't have anything to do with the facts of our case, which doesn't involve subway searches. I don't believe this policy was around at the time that these incidents took place. Just doesn't seem to have anything to do with our case.

THE COURT: All right. I will consider it.

The questions 22 through 26?

MR. HARRISON: Judge, I apologize. One more thing just on that. I would ask that it be taken out. If it wasn't, certainly the quotes should be taken out. There is no point to the quotes. That is just sort of editorializing.

THE COURT: Quotes?

MR. HARRISON: Around "deter terrorism " and around

"random subway searches."

THE COURT: I see. Okay.

MR. STOLAR: I can live without the quotes.

THE COURT: Okay. Then there is a set of questions 22 through 26. These have been added by the defense?

MR. STOLAR: Just 22 was added; 23, 4, 5 and 6 were in the previous one that we discussed.

THE COURT: Which ones are in dispute?

MR. STOLAR: Mr. Harrison objects to 22 through 26.

THE COURT: All right. What does the Patriot Act have to do with this or their views on it?

MR. STOLAR: It gives me some information about a juror and their feelings about how they view the principles of law that the current administration is pursuing and gives me some insight into whether or not I think that person could be a proper juror in a case like this. Some of the charges that are in the indictment are part of the USA Patriot Act.

THE COURT: Right. Whether the jurors like it or don't like it is not how they are supposed to base their decision on guilt or non-guilt. I am a little troubled by that. 23 and 24, I think that the -- 25 I think we do need to ask jurors whether they had any experiences with regard to the September 11th attacks and their views on that that might affect their ability to be fair. That seems to me to be appropriate here.

MR. HARRISON: That's fine. Let me just -- we could start that by asking the question, what is your experience, if any, of the September 11th attacks.

THE COURT: Everybody in New York had some experience.

MR. HARRISON: Right. Assuming these jurors were here at the time. I would still -- these three -- these sets of questions, 22 through 26 frankly, as Mr. Stolar indicated, again simply going towards politicizing the case. This has nothing to do with the case, politics. It doesn't have anything to do with the Patriot Act. It doesn't have anything to do with the war in Iraq. The 25 says "because this case involves allegations of terrorism," frankly there are no specific allegations of terrorism.

MR. STOLAR: There certainly are.

MR. HARRISON: I am not finished talking.

The allegations are that this defendant conspired to place a bomb in a subway. That's it. We are not alleging that he was part of Al Quaeda or part of any larger terrorist organization.

MR. STOLAR: The proof, Judge, in this case, is going to come out that the confidential informant was pretending to be a terrorist, Part of the Muslim Brotherhood. That he induced my client to do this by showing him pictures and inducing him about the terrorism that was conducted by the

United States in doing the war in Iraq and Afghanistan. It is going to come out here. That's part of the case.

Whether he says it's terrorism or not, those are discussions that are on the tapes and that's the discussions between my client, Mr. Elshafay, and the government's confidential informant. That's going to be out there. So the people's understanding of this issue has to be brought out in voir dire.

THE COURT: All right.

MR. STOLAR: Because it is coming out.

THE COURT: I will frame a question that I think is appropriate.

Questions 27 through 33, was there an objection about that?

MR. HARRISON: Yes, Judge.

THE COURT: All right.

MR. HARRISON: Again, if the Court wants to ask one or two focused questions about simply does anyone have any specific prejudices against -- the fact the defendant is a Muslim, will that affect your ability to be impartial. Is anyone prejudiced about the fact that he is originally from Pakistan, will that affect your ability to be impartial? That's fine.

I don't think that people's specific knowledge about the history and practices of the faith of Islam is proper. I

don't think asking them do they have any Muslim friends or family members are proper. If someone was part of another group, Caucasian, African-American, Catholic, Hispanic, whatever it was, we won't be asking those questions. There is not a reason to ask them.

MR. STOLAR: On the contrary, if I had a client who was an African-American client, I certainly would be asking people, have you had an experience with an African-American young male that makes it impossible for you to sit on this jury.

The same way the practices of Islam are discussed throughout the conversations between my client and the confidential informant and --

THE COURT: That's what I was going to ask. Is that correct?

MR. STOLAR: Yes.

THE COURT: In what way?

MR. STOLAR: They talk about Islam. They talk about what Jihad means. They talk about what the role of the Brothers are. They talk about the war in Iraq.

I mean, all these things come out in the course of the conversations. If they are going to come out in the course of conversations that the government is going to play for the jury, then I think I am entitled to have the jurors questioned about whether they can sit and listen to this stuff

without being predisposed, to quote a phrase, towards convicting my client.

THE COURT: Then rather than say "knowledgeable about it," isn't the appropriate question whether or not they have any biases with respect --

MR. STOLAR: It is. But take, for example, question 31. Do you believe that Islam endorses violence to a greater or lesser extent than other major religions? There are people who think that if you are a Muslim, you must be a terrorist. That Muslim -- that Islam endorses violence. If somebody has that idea, I don't want them on the jury. Because Islam does not endorse violence. But people believe that, post 9/11. I don't want those folks sitting on the jury. I want them to be able to sit here in the privacy of a questionnaire and answer that question truthfully, not in open court, in front of two hundred other people.

MR. HARRISON: But the -- one of the problems -- I object to the question at all, but one of the problems is the way it is phrased, again, which is, do you believe that Islam endorses violence to a greater or lesser extent than other major religions. It is a very complicated asking questions, asking them to contrast and compare other religions in the world, and secondly, it doesn't even leave them an option to say that they consider violence somehow in the same way as other major religions.

MR. STOLAR: Yes, it does.

MR. HARRISON: There can be a simple question that asks, do you believe the fact that the defendant is Muslim and the fact that the faith of Islam will be referred to in this trial, does that in any way affect your ability to be fair and impartial.

THE COURT: All right. Counsel, I will work on that.

Questions about, I believe we discussed this last time, to ask what they understood the term "Jihad" to mean and were they open to other alternative interpretations. These are both your questions?

MR. STOLAR: Yes.

THE COURT: Are there objections to both of them?

MR. STOLAR: Apparently.

THE COURT: Mr. Harrison?

MR. HARRISON: Yes, Judge.

Frankly, I don't even know what 33 means. Are you open to alternative interpretations than those are presented? That's simply not a proper question for voir dire.

Is the defense asking, are you going to buy our theory of the case? That's not a proper question for voir dire, first of all, as 33.

MR. STOLAR: The problem is this, it may very well be that --

THE COURT: Let me interrupt you for a second.

The last time was there some suggestion that we are going to have -- someone was going to suggest there was going to be expert testimony as to what "Jihad" means?

MR. STOLAR: It is possible.

MR. HARRISON: I didn't plan to have any.

THE COURT: It seems to me that the issue is what the defendants meant if they used the term and not what some academic expert means.

MR. STOLAR: Translate the term to me. I am concerned there are jurors who hear the word "Jihad" and "Jihadis" and instantly think that that means violence. That's not the case.

THE COURT: No. But the witness who uses the term will be on the witness stand, right? You will be able to ask that witness, if you choose to, what did you mean by the word "Jihad."

MR. STOLAR: I am assuming they are going to call the confidential informant.

THE COURT: And that you would ask that question?

MR. STOLAR: I would.

THE COURT: I need to think about that before trial. I am a little skeptical. An expert could have --

MR. STOLAR: We can drop number 33. I definitely want number 32.

MR. HARRISON: Again, it is not -- we are going to run into problems when they ask, what, if anything, do you understand the term "Jihad" to mean. It is not really up to them.

First of all, as Your Honor points out, any references to the Jihad, the witnesses can be asked about them. Secondly, Mr. Stolar made reference to the fact there is some mention of that term on the tapes. Those conversations are on tapes. People were discussing them for the jury to hear. They can listen to that and make their -- it is not relevant what they think. It is relevant what the evidence shows.

MR. STOLAR: Don't I want to know what is in the mind of a potential juror when they hear this term? Is it going to immediately turn them off into thinking, oh my God, if they are talking Jihad, they are talking holy war. That's -- it is just pervasive throughout the political arena that we find ourselves in.

MR. HARRISON: The --

MR. STOLAR: I should be able to inquire into that juror's particular frame of mind on this question, the use of the word.

MR. HARRISON: I could have submitted a thousand questions that I would like to know every little detail of what a juror is thinking. That's just not -- it is not

proper for voir dire. We could be here forever asking them all the questions that each of us wants to ask. They have to be somehow relevant to this.

What -- I just don't think that that's relevant. We are not going to be -- their term or their definition of the word "Jihad" is not relevant. It will be what the evidence shows. The evidence will come from the witnesses who testify and from the tapes that they are gong to be allowed to hear.

MR. STOLAR: I am asking you not to blind yourself to the political aura in which this case is being tried. This is post 9/11, where Muslims are accused of terrorist acts to knock down the World Trade Center. This is a Muslim who is accused of a terrorist act to blow up the New York City subway system. It comes on the heels of a subway bomb in Madrid and London by Muslims and so people are going to come in here with a little bit of prejudice. To explore their understanding of what the atmosphere is and whether they can give this man a fair trial, given who he is and what he is accused of, I think is significant. It is not -- you can't put blinders on and disregard that.

THE COURT: All right, counsel. I will work on it.

MR. STOLAR: Okay.

MR. HARRISON: I'm sorry. The only other related thing, if Mr. Stolar is going to be getting experts, I need to

have notice of that pretty quickly. We are approaching a trial date. If he is going to do that I need to find out who the experts are and perhaps get my own experts.

THE COURT: Yes.

MR. STOLAR: We will give you appropriate notice.

THE COURT: Why don't you give us a date, Mr. Stolar?

MR. STOLAR: I certainly will do it by the beginning of April. Say April 3rd?

MR. HARRISON: Judge, that only gives me two weeks before trial to figure out what's going on.

THE COURT: You have a lot of time. Why don't you decide this earlier. I am skeptical that experts will be needed. If you are going to have litigation over it, let's do it sooner rather than later.

Give me an earlier date, please.

MR. STOLAR: All right. How about March 22nd?

MR. HARRISON: Judge, frankly, I would ask for that sooner. Frankly, it is really putting me in a bind. I am not going to be here in March. This is the first time hearing about a potential expert witness. I need to know within the next couple of weeks.

THE COURT: Can you let Mr. Harrison know by the end of February?

MR. STOLAR: Yes, I can do that.

THE COURT: Okay. Counsel, the only other thing with regard to the questionnaire is that I am considering adding to the questionnaire just a couple of other questions that normally I would be taking at side bar, which would be the question of hardships, someone has a prepaid vacation or something of that nature, or medical problem, and then whether they've ever been accused of or been a victim of crime. We may be able to move things along a little bit. I don't want to expand the questionnaire too much. I think I may be doing that.

MR. STOLAR: Also, Mr. Harrison objected to questions 37 through 40.

THE COURT: I think that it would be appropriate, Mr. Harrison, as you already said, to ask whether or not the fact that the defendant was an immigrant from Pakistan would affect the juror's ability to be fair.

MR. HARRISON: Yes, Judge.

THE COURT: The other two seem well into being innocuous.

MR. STOLAR: Yes.

THE COURT: Whether they traveled to Pakistan or have friends or acquaintances who are Pakistani. It won't point one way or the other to -- nobody is going to be excusable for cause if they answer yes or no to that.

MR. STOLAR: Right.

I do have one other issue.

THE COURT: Any serious objection to those?

MR. HARRISON: That's fine, Judge.

THE COURT: Okay. All right. What else?

MR. STOLAR: The other issue, I am wondering if the Court would entertain an order directed to the Metropolitan Detention Center allowing my client to review the transcripts and the CDs for more than one day per week, which is now permitted only on Tuesday.

THE COURT: How far along is he?

MR. STOLAR: He's gotten almost to the last conversation on the eighth disk and there are fourteen. We are coming close.

MR. HARRISON: Judge, actually I did follow up with the MDC on that. My understanding is that -- what they told me is that Mr. Matin is allowed to go to the law library one day a week to listen to those items. They said that they are happy, based on the volume of stuff that he has, to give him more time.

THE COURT: Okay.

MR. HARRISON: In fact, I have a little bit more --

THE COURT: What do we have to do to effectuate --

MR. HARRISON: He has to request it through his counselor or unit supervisor.

MR. STOLAR: He indicates to me he has requested and

she said no.

MR. HARRISON: I --

MR. STOLAR: The counselor told my client that he needs an order from the Court.

MR. HARRISON: I just asked again today. They said there hadn't been a request. They said if there is a request, he could go from eight to eleven, Monday through Friday as well, I believe.

THE COURT: All right. Shall we just do an order to that effect?

MR. HARRISON: If you want to, Judge.

THE COURT: Okay. If there is no objection, let's just do that.

MR. STOLAR: I will submit an order to you.

THE COURT: We will say that the defendant is authorized to listen to -- how shall we phrase it? Listen to tapes?

MR. STOLAR: Listen to CDs and make corrections to transcripts.

THE COURT: And make corrections to transcripts at the law library at the MDC on Tuesdays and --

MR. STOLAR: Monday through Friday is what --

THE COURT: No. Tuesday is all day.

THE DEFENDANT: Tuesday is from morning, six to -- one shift goes one in the morning, six to -- until the

recall.

THE COURT: I don't want to make it shorter than he's already doing. In addition to Tuesdays, Monday, Wednesday, Thursday and Friday from what was it? Eight to eleven?

MR. HARRISON: Eight to eleven.

THE COURT: Okay. Just monitor that, Mr. Stolar.

MR. STOLAR: I will.

THE COURT: If you hear that's not happening, get in touch with Mr. Harrison. If need be, with the court.

MR. STOLAR: Thank you.

THE COURT: Is there Anything else before next week then?

MR. STOLAR: Not that I can think of.

MR. HARRISON: I am sorry, Judge. I had a couple of more questions about the questionnaire.

THE COURT: All right.

MR. HARRISON: Your Honor had indicated, I believe, in the transcript of the day that I wasn't here that you were going to ask a question about military service as well. I didn't know if that was part of your oral, your usual oral questions or we should put it in the questionnaire.

THE COURT: I don't always ask about military service. I can, if you want me to.

MR. HARRISON: Okay. We would request that, Judge.

THE COURT: All right.

MR. STOLAR: As I indicated at the conference, the questionnaire that Mr. Harrison put in, the thirty-eight page questionnaire, is a good framework for an oral voir dire.

THE COURT: All right. Counsel, how much time will you need in order to duplicate this questionnaire?

MR. STOLAR: Sorry?

MR. HARRISON: You mean after they fill it out?

THE COURT: No. When do you need to get it from me, the questionnaire that I intend to use?

MR. STOLAR: A week before, I think.

MR. HARRISON: Maybe to be safe, a couple of weeks before, Judge, if that's okay.

THE COURT: Okay. As we get closer to it, we will discuss the logistics. I have some ideas regarding the logistics of this. We can discuss that as we get closer to it.

MR. STOLAR: Okay.

THE COURT: All right. Thank you, counsel.

MR. STOLAR: Thank you.

MR. HARRISON: Thank you, Judge.

(Matter concludes.)