# EXHIBIT A

ALAN M. GOLDSTEIN, PH.D.
N.Y.S. CERTIFIED PSYCHOLOGIST, P.C.
CT. LICENSED PSYCHOLOGIST
DIPLOMATE IN FORENSIC PSYCHOLOGY
AMERICAN BOARD OF PROFESSIONAL PSYCHOLOGY

13 ARDEN DRIVE
HARTSDALE, NEW YORK 10530
(914) 693-7760

NEW YORK CITY:
(212) 580-3600
FAX: (914) 674-2563

## PRIVILEGED AND CONFIDENTIAL
## FORENSIC PSYCHOLOGICAL EVALUATION

| | | | |
|---|---|---|---|
| Defendant: | Shahawar Matin Siraj | Dates Evaluated: | 08/31/06 |
| | | | 09/19/06 |
| Cr. No.: | 05-104 (NG) | | |
| D.O.B.: | 05/26/82 | Date of Report: | 10/14/06 |
| Age: | 24 years | | |

Shahawar Matin Siraj was referred for forensic psychological evaluation by his attorney, Martin R. Stolar, Esq. According to Mr. Stolar, his client (hereby referred to as "Mr. Matin") was found guilty of the charges filed against him, following a jury trial. I was asked to assess Mr. Matin for sentencing purposes.

Mr. Matin was evaluated by me at the Metropolitan Detention Center in Brooklyn. At the time of my assessment, Mr. Matin was being held on the Special Housing Unit. I conducted two evaluation sessions with the defendant, totaling six to seven hours.

During my interviews with him, I questioned him regarding his background and the circumstances involved in the instant offense. I also administered a battery of tests to

him, measures commonly used in the fields of clinical and forensic psychology. Testing consisted of the following instruments:

Wechsler Adult Intelligence Scale – Third Edition (WAIS-III)

Validity Indicator Profile (VIP)

Rotter Incomplete Sentences Blank – Adult form

Personality Assessment Inventory (PAI; independently scored and interpreted)

Hare Psychopathology Check List – Revised: 2nd Edition (PCL-R: 2)

I was provided with documents by Mr. Stolar and have reviewed them prior to the preparation of this report. The records I reviewed consisted of the following:

FBI Report of Interviews (8/28/04)

School records:

St. Paul's English High School (Summer 1991)

Report Books – St. Paul's English High School (1994 through 1997)

A-Technical Institute (undated)

St. Andrew's High School records (7/26/99)

Letter from St. Paul's English High School (11/3/05)

Birth Certificate (5/26/82)

Direct Examination of Defendant – Hearing (beginning at page 97)

Cross-Examination of Defendant

Testimony of Shahina Parveen

Testimony of Defendant (undated)

**Brief Summary of Records Reviewed:**

As noted, I have reviewed FBI investigation reports as well as testimony offered by the defendant at hearings and during his trial. These records are not summarized in this report. It is noted that the information provided to me by Mr. Matin regarding his involvement in this crime is consistent with the testimony he has previously offered.

According to his school records, Mr. Matin completed a six week course in "English Conversation" in the summer of 1991. At that time, he was a student at St. Paul's English High School in Karachi, Pakistan. A letter submitted by officials at that school (11/3/05) indicated that he had been admitted to their program on 11/08/90 and left the school on 6/5/97. Mr. Matin was described in this letter as, "a hard working student.... He bears [sic] a good moral character."

A review of Mr. Matin's" report books" from St. Paul's finds that in general, his grades were in the 60's, but with the exception of one academic year, he was promoted from one grade to the next. During one academic year (1995-1996), Mr. Matin's final average was approximately 50 but, nonetheless, he was "Promoted on trial." However, the next year, when his final average was approximately40, Mr. Matin was required "To repeat."

Mr. Matin attended St. Andrew's High School in Karachi. Despite a grade of "D" in his science examination in 1999, he received a Provisional Certificate. According to this record, Mr. Matin was of, "good moral character." His Statement of Marks (7/26/99) reported grades of well under 50%.

Mr. Matin attended the A-Technical Institute in Forest Hills, NY. There, he completed a course as a PC Technician, based upon a classroom training program.

**Interviews of Defendant:**

Prior to the start of my initial interview, using simple language, I explained to Mr. Matin the nature and purpose of this assessment. I informed him that I was evaluating him for sentencing purposes and that I would need information regarding his background and history and that I would administer a battery of tests to him. I explained that any and all information I learned about him would be included in my report if his lawyer asked me to submit one whether it was positive or negative.

Although Mr. Matin immediately grasped the concept that I was seeing him at the request of his attorney to discover, "…what's wrong and to get lesser time," he had difficulty understanding that my report would be an objective one. When this was again explained to him, Mr. Matin was able to paraphrase this information stating, "…if it helps or not [it will be included]."

At the start of the second evaluation session, Mr. Matin was unable to recall my name although he understood that I was seeing him at the request of Mr. Stolar. A number of simple questions had to be asked of him in order to clarify that he understood the purpose of the evaluation: "So you can tell the judge what is happening with me." He could not spontaneously recall that the overall purpose of this assessment was for sentencing purposes. However, again when the nature of this assessment was re-explained to him, Mr. Matin was able to acknowledge that, "She may use it." He also understood that, "if it's good or bad, you will put it in the report."

   *Background and History.*

According to Mr. Matin, he was born in Karachi, Pakistan. When asked his age at the time of his initial evaluation, he stated, "24 or 25." He gave the same response at the start of the second evaluation session and when confronted with the likelihood that he did not know or recall his actual age, Mr. Matin explained, "I don't count. I was 22 when I got arrested. I just don't know that."

Although Mr. Matin was uncertain of the age of his parents, he believes that his father, Siraj Abdul Raham, is approximately 58 years old. In Pakistan, his father owned a general store. When the family immigrated to the United States, his father began to work at a bookstore. Mr. Matin describes his father in positive terms, stating, "He's very good and all my life I've seen him. He's everything to me." As a child, when Mr. Matin misbehaved, he recalled that his father, "sometimes used to shout and two times, beat me."

Mr. Matin estimated that his mother is, "more than 50." In Pakistan, his mother, Shaina Berbeen, was a medical doctor who, "had her own clinic and stopped when my sister was born, but it was homeopathic medicine." In the United States, his mother never obtained a medical license or training to work as a physician and, "she don't do nothing."

According to Mr. Matin, he has a sister, now age 18. Although he believes that his sister graduated from high school, Mr. Matin could not provide more up-to-date information about her.

Mr. Matin reported that he completed the 10th grade in Pakistan, explaining that this is the equivalent from having graduated from high school in the United States. Consistent with the records I reviewed, he reported that as he progressed in school, his grades began to deteriorate. "I had a problem and they used to fail me, beat me up, punish me." Mr. Matin explained that he was the object of ridicule and physical punishment in school, often by his teachers "because I was Agakahana, a different set of Muslim, disliked by Shias and Sunis. I didn't know how to read Koran." He reported that, "I graduated, but I just had passing marks." At no time in his school career did Mr. Matin see a psychologist, psychiatrist, or social worker.

Mr. Matin denied that he was ever suspended from school. However, he recalled that on one occasion, he had been, "punished and had to kneel in the sun and they [his teachers] hit my hand with a cane because I didn't do Isalmia homework or I was late for school or I wore the wrong shoes."

According to Mr. Matin, while in the United States, he attended and completed a technical program, A-Plus, where, "they taught me how to fix computers." He could not recall the specific length of this program, believing it lasted for "a few months. I have a problem with memory. I forget a lot of stuff."

Mr. Matin explained that while residing in Karachi, he would help his father at the general store. At age 10 or 11, Mr. Matin worked at the counter and, "I would take the money. "

Mr. Matin reported that he first came to the United States in 1996. At that time, he would have been approximately age 14. He remained here, on vacation with his grandparents, for approximately two months. The family then returned to Karachi. In 1999, Mr. Matin, accompanied by his mother, father and sister, returned to the United States. He explained, "… because I want to see the United States and we stayed." Mr. Matin reported that the family requested asylum and, "they keep giving us extensions."

In the United States, Mr. Matin has held a number of jobs. He first obtained employment working as a delivery boy at a Blimpy's. He then worked making sandwiches at a grocery store. Mr. Matin was employed for a period of time selling cellular telephones, then returning to his job in the grocery store, until he began to work at his uncle's bookstore. "I was there when I was arrested."

Mr. Matin minimized problems with his physical health, explaining that when he was age 16 or 17, he received treatment at Elmhurst Hospital for back pain. He reported that while being held on the Special Housing Unit at the Metropolitan Detention Center, he has experienced problems, "waking up and I told the psychiatrist that I used to hear my mom calling my name but she was not there…." At times, Mr. Matin reported that he will continue to hear his mother's voice but, "I didn't tell the psychiatrist about the voice because I didn't want no medicine. I don't trust no medicine."

Mr. Matin denied any prior mental health problems that pre-date his arrest. He reported, however, that he has a tendency to "get angry." I can't control stuff and I say things and I don't realize what I say and then I say I'm sorry." Mr. Matin denied that he has ever acted out on his feelings of anger. He attributed his involvement in the instant offense to this tendency to easily become agitated and upset. Mr. Matin reported that he would become angry, "with customers and the way that guy got me involved with a conspiracy

and he made me mad with pictures of people, sisters getting raped. He played with my emotions and I fell into in."

Mr. Matin reported that prior to his arrest on these charges, he had been arrested, charged with Third Degree Assault "in my store. It was in June, the same time as this [arrest] or prior to that." Mr. Matin claimed that a customer had gotten into an altercation, "with another guy [in the store]. They say I pushed [sic]. They dropped it. It was just an appearance ticket and then I was arrested for this [the current crime]."

Although Mr. Matin has met women for dinner, "dating," he denied ever having engaged in a sexual relationship with a woman. He explained he had met a woman in Pakistan through the internet and, "I was going to marry her. However, they take it all away. I spoke with her mom and my mom. We did go out, but no sex - - we eat food in a diner."

Consistent with his religious beliefs, Mr. Matin denied the use of alcohol, "never in my life." Similarly, he denied the use of any illegal drugs. As a child, he ran away from home one occasion, "for a few hours." He denied ever abusing his parents or stealing from them or from other relatives. Similarly, Mr. Matin denied that he has ever mistreated his parents or other caregivers, either physically or verbally.

Mr. Matin reported that he has never had a credit card nor has he ever owed money without repaying it. He explained, "I always pay it back. People borrow from me, but I never get it back. Mr. Matin denied ever obtaining a driver's licenses. He recalled that he has had worked as a volunteer, "as a scout person, helping people cross the street and stopping traffic, for our community."

When asked to compare himself to his sister, consistent with other information he provided, Mr. Matin explained, "I'm a little more crazy. I get angry and upset. My sister is very calm." Mr. Matin explained that he continues to feel angry, but, "I control myself by praying and I meditate and think." Mr. Matin denied that he has ever physically hurt another person. Similarly, he explained that in the past, "I used to get angry over small

stuff. I would drink cold water and lay down for a few minutes [to control his feelings of anger]."

When asked whether he had ever "lost control" over his behavior, Mr. Matin's response was consistent with his failure to make a distinction between his underlying thoughts of anger and agitation versus acting on his aggressive thoughts and feelings. "I cursed Americans when Mr. Daoudi showed me a small girl with a dog [allegedly raping her] and I exploded and I couldn't take it. I couldn't see the rapes."

Consistent with other responses during the evaluation sessions, Mr. Matin indicated that, "I feel really, really bad and apologize to everybody [about his involvement in the instant offense]. I was just foolish, just angry. It came out from inside." Although he accepted responsibility for his involvement in the instant offense, Mr. Matin stated, "If he [Mr. Daoudi] never came into my life, I'd never be arrested."

*Observations of Behavior.*

Throughout both evaluation sessions, Mr. Matin was cooperative and polite. He demonstrated a wide range of emotions, at times appearing clinically depressed and at other times somewhat agitated and anxious. On occasion, his eyes weld up with tears, especially when he reported that he had been shown a picture of, "a small kid raped by a dog."

Mr. Matin reported a number of physical complaints and, when he encountered difficulty on the WAIS-III, an objective intelligence test, he began to complain about a headache. Mr. Matin expressed himself in logical, orderly terms. No evidence for an underlying thought disorder was found. Mr. Matin appeared capable of maintaining his attention and no problems in concentration were noted. At times, his speech was somewhat rapid and pressured. Despite the fact that English is his second language, Mr. Matin appeared to have little or no difficulty in understanding questions asked of him and in responding to these queries.

**Results of Testing:**

Mr. Matin was administered the Wechsler Adult Intelligence Scale – Third Edition (WAIS-III), the most frequently used intelligence test in the United States. Because of Mr. Matin's language and cultural differences, the results of this test must be cautiously interpreted.

Mr. Matin's overall or Full Scale IQ of 78 falls within the Borderline range of intellectual functioning and would be surpassed by 93% of the general population. With a 95% degree of certainty, his actual Full Scale IQ falls between 74 and 83.

The WAIS-III consists of two major sections, subtests that measure verbal intellectual functioning and those that tap non-verbal skills and abilities. Those from other cultures and for whom English is a second language are a distinct disadvantage on the verbal subtests that comprise this instrument. It is of note that Mr. Matin's overall score on the non-verbal section of the WAIS-III is lower than his measured verbal level of functioning (although not statistically so), suggests that although from a different cultural, Mr. Matin's obtained IQ's appear to be relatively valid reflections of his actual intelligence.

Mr. Matin's Performance IQ of 77 falls within the Borderline range of intelligence. His score on the non-verbal section of the WAIS-III would be surpassed by 94% of the population. To a 95% degree of certainty, Mr. Matin's actual Performance IQ falls between 72 and 85. His Verbal IQ of 82 falls toward the lower limit of the Low Average range of intellectual functioning. This score would be surpassed by 88% of the population and, to a 95% degree of certainty, Mr. Matin's actual Verbal IQ falls between 78 and 87.

Subtests on the WAIS-III are grouped, based upon empirical studies, into four separate indices, each of which measures a different overall aspect of intelligence. Mr. Matin's scores on these indices range from the Borderline to the Low Average category. Specifically, Mr. Matin's lowest score was obtained on the Processing Speed Index. His

score of 71 would be surpassed by 97% of the population. Mr. Matin responded to timed tests in a ponderous, slow manner, in part reflecting his relatively low level of overall intelligence and the deleterious effects of depression, which slowed his overall speed of in responding. Mr. Matin's score on the Verbal Comprehension Index of 82 would be exceeded by 88% of the population. As such, his overall vocabulary, his judgment and reasoning, and his ability to think abstractly are impaired compared to the general population. Mr. Matin obtained an identical score on the Perceptual Organization Index. This low level of performance is consistent with his overall IQ, his other scores on the indices of the WAIS-III, and his other WAIS-III subtest scores. Mr. Matin's perceptual organization skills, as measured by tasks that are relatively free from cultural and language abilities, support the opinion that he is intellectually limited.

Mr. Matin's strongest overall abilities as measured by the WAIS-III were obtained on those subtest associated with the Working Memory Index. His score of 86 falls within the Low Average range and would be exceed by 82% of the general population. Mr. Matin's ability to concentrate and focus attention is not as significantly impaired as other skills measured by the WAIS-III.

Mr. Matin's vocabulary, the single most representative subtest associated with overall intelligence was found to be Borderline. Similarly, his reasoning and common sense was Borderline as well. His lowest verbal ability was his skill at being able to think in abstract terms. Mr. Matin's analytical skills are significantly limited. His thinking tends to be overly concrete, superficial, and overly simplistic. Mr. Matin's mathematical abilities and his skill at being able to concentrate when presented with a verbal task involving memory was found to be Borderline to Low Average. On another task of short-term memory and on a measure tapping general knowledge (many questions dependant on exposure to our culture) his ability was found to be average.

As previously noted, Mr. Matin's lowest scores were obtained on the Performance section of the WAIS-III. His lowest score, mildly mentally retarded, was obtained on a test measuring his acquisition of new non-verbal material. He obtained mildly retarded to

Borderline scores on a task requiring motor response, concentration, and perceptual focusing. Similarly, on a task requiring Mr. Matin to focus on the essential elements of a perception, his low score is indicative of a susceptibility to distraction, especially by irrelevant perceptual information. Mr. Matin's ability to make use of subtle cues in order to establish cause and effect relationships was found to be Borderline to Low Average. On perceptual tasks measuring the ability to integrate parts into a meaningful whole pattern and to form focused judgments based on his perceptions, Mr. Matin's score was Low Average.

Because of cultural and language differences, typical objective tests used to evaluate personality traits and characteristics were not administered. For example, the MMPI-2 requires an eighth grade reading level, is culturally loaded, and, as such, it was not administered. However, the Personality Assessment Inventory (PAI), an objective personality measure written at the fourth grade reading level was administered to Mr. Matin. This test was independently scored and computer-interpreted.

Despite the fact that the PAI test is written for those reading at or above the fourth grade, the results on this instrument were found to be invalid. The results suggest, "…problems attending to or interpreting item content…. There are several potential reasons for this failure to attend, including reading difficulties, careless or random responding, marked confusion or idiosyncratic item interpretation, or failure to follow the test instructions." As a result, the computer-interpreted report provides no clinical interpretation.

Despite the lack of overall validity of the PAI indicated in the computer-generated report, it noted that Mr. Matin's scores on the many of the subtests that comprise the PAI are consistent with his reported history, clinical impressions formed during the evaluation session, and his current life situation. The PAI reports a preoccupation with physical complaints, underlying depression affecting his thinking, his belief that he is being persecuted and a sense of resentment. These findings are consistent with Mr. Matin's current situation. In addition, results on the PAI suggest problems with self-identity, an aggressive attitude (that does not necessarily culminate in acts of physical aggression)

and unusual ways of thinking and reasoning. It is of note that Mr. Matin's scores on those subtests that measure antisocial behaviors, egocentricity and stimulus-seeking do not fall within the clinical range. Again, however, because of the lack of validity on this instrument, as a whole, these scores must be cautiously interpreted.

On the Rotter Incomplete Sentences Blank, a projective personality test, Mr. Matin reports that family is of prime importance to him. His responses to this test also suggest the significance role that his religious beliefs and values play in his life. Mr. Matin's responses reflect his perception that, as a child, he felt victimized by others (consistent with his self-report that he had been mistreated in Pakistan because of his religion). His responses reflect underlying feelings of depression, his sense of isolation from others, and feelings of remorse related to his involvement in the instant offense.

Mr. Matin was administered the Validity Indicator Profile (VIP) which was independently scored and interpreted. This objective instrument is used to provide information as to the validity of intelligence tests and other measures of cognitive ability administered concurrently to the VIP (i.e., Is it likely that the examinee made a conscious effort to appear intellectually limited?). Because of his verbal limitations, only the nonverbal subtest of the VIP was administered to Mr. Matin.

The computer-generated report indicates that his performance on this subtest was Valid. Mr. Matin approached this test in a manner suggesting that he was Compliant with instructions and that he made a strong effort to respond to test items in a correct manner. He did not make a conscious effort to appear intellectually slower than he actually is as measured by the WAIS-III. When test items became more difficult, Mr. Matin transitioned from knowing to guessing rather than providing incorrect responses that would suggest a low level of intellectual functioning. The results of the VIP indicate that Mr. Matin's performance on the WAIS-III represents a valid measure of his current level of intellectual functioning.

Based upon Mr. Matin's history, the information obtained during the interview, and my review of the records, the Hare Psychopathy Check List – Revised: 2nd Edition was completed. The results of the PCL-R:2 fail to establish the presence of psychopathy (psychopathic traits and characteristics). Similarly, based upon Mr. Matin's history and presentation, a diagnosis of Antisocial Personality Disorder would be incorrect and such a diagnosis does not represent a valid explanation for his involvement in the instant offense.

None of Mr. Matin's scores on the PCL-R:2 indicate the presence of psychopathy. His life history and his overall presentation do not indicate a psychopathic lifestyle or psychopathic traits or characteristics. For example, Mr. Matin does not relate in a superficial or glib manner. He does not manipulate others for his own ends, demonstrate irresponsibility, nor does he exhibit shallow affect. Mr. Matin does not have a grandiose sense of self-worth, present with a history of poor behavioral controls or demonstrate early behavioral problems -- behaviors and traits associated with psychopathy. When his behavior is rated conservatively on this instrument based solely upon statements he made to FBI investigators and in his trial testimony, on only three items does Mr. Matin receive any scores suggesting psychopathic characteristics. As such, he was rated positively on those items measuring pathological lying, lack of remorse and failure to accept responsibility for his actions.

**Opinions:**

The opinions presented in this report are based upon two interviews conducted with Mr. Matin, his responses to the tests administered to him and my review of the records cited in this document. Each opinion is offered to a reasonable degree of psychological certainty.

- Mr. Matin is intellectually limited as measured by his performance on the WAIS-III. Although Mr. Matin is from another culture and English is a second language for him, his performance on the nonverbal subtests of the WAIS-III

tended to be somewhat lower than those obtained on the verbal subtest of this instrument. His thinking is overly simplistic and highly concrete. His critical thinking skills and his ability to analyze situations in depth are impaired. As such, his common sense and judgment is diminished.

- Mr. Matin is a relatively naïve, suggestible person. He is lacking leadership skills and based upon his intellectual limitations, he is susceptible to the manipulations and demands of others. It is of note that Mr. Matin consistently emphasized his tendency to act on feelings he described as "anger." However, he did not present a prior history of physical aggression directed toward others. Rather, Mr. Matin is an individual who is easily agitated. At such times, his simplistic thinking and judgment is likely to become clouded by his emotions, reflecting his underlying sense of agitation rather than judgments based upon analytical skills and focused cognitive processes.

- The issue of remorse and its genuineness cannot be objectively measured by any forensic mental health professional. Rather, it must be inferred from observations of behavior and the consistency of statements made by a defendant. Although Mr. Matin's statements proferred to FBI investigators and to the court during hearings and at his trial indicate a denial of responsibility for his involvement in the instant offense (and therefore a lack of remorse), during these evaluation sessions, Mr. Matin expressed feelings of regret, guilt, and sorrow for his behavior. He appeared to cry when he spoke of the possible consequences of his involvement in the instant offense. (On the Rotter Incomplete Sentences Blank, on a number of items, Mr. Matin reflected his feelings of remorse (i.e. *I* …want to apoligised [sic] to every one [sic] who got hurt by my bully talking); *I hate*… my self [sic] for what I did in past [sic]).

In summary, to a reasonable degree of psychological certainty, it is my opinion that Mr. Matin's intellectual limitations and his personality characteristics were major pre-disposing factors, increasing the likelihood of his involvement in this illegal activity.

The degree to which cultural and religious factors played a significant role in his involvement cannot be determined based upon my expertise.

Alan M. Goldstein, Ph.D.
Board-Certified in Forensic Psychology
American Board of Professional Psychology

AMG/dh

*CURRICULUM VITAE*

**Alan M. Goldstein, Ph.D., PC**
**Board Certified Forensic Psychologist - ABPP**
**New York & Connecticut Licensed Psychologist**
**13 Arden Drive**
**Hartsdale, New York 10530**
**(914) 693-7760          (212) 580-3600**
*alanmg@optonline.net*

## EDUCATION:

| | |
|---|---|
| Ph.D. | Fordham University, Clinical Psychology, 1971 |
| M.A. | Fordham University, Psychology, 1967 |
| B.A. | Hunter College, Psychology/Sociology with Honors, 1965 |

Board Certification in Forensic Psychology, American Board of Professional Psychology, 1988

Approximately 800 hours of APA-approved forensic psychology CE including:

> *Competency to Stand Trial     Assessment of Criminal Responsibility*
> *Validity of Miranda Waivers  Juvenile Forensic Assessment*
> *Death Penalty Assessments     Assessment of Malingering & Deception*
> *Clergy & Teacher Sex Abuse   Risk Assessment/Sentencing Evaluations*
> *Expert Witness Testimony       Assessing Violent Sexual Predators*
> *Prediction of Dangerousness   Use & Abuse of Expert Testimony*
> *Ethics of Forensic Expertise   Evaluating Allegations of Sexual Abuse*
> *Diagnostic & Structured Interviewing: Applications to Forensic Evaluations*
> *Child Custody Evaluations     Forensic Hypnosis*
> *Forensic Assessment of Battered Woman & Rape Trauma Syndrome*
> *Terminating Parental Rights  Use and Abuse of the MMPI-2 in Court*

## CURRENT POSITIONS:

**Professor of Psychology**, John Jay College of Criminal Justice, City University of New York (former Chair, Department of Interdisciplinary Studies), 1970 - 2000;  (Professor Emeritus: 2001 - present) teaching advanced Master's & Doctoral courses including:

> *Psychology and the Law                Ethical Issues in Forensic Psychology*
> *Psychological Evaluation, Consultation & Expert Testimony*
> *Role of the Forensic Psychologist in Death Penalty Litigation*

**Doctoral Faculty Clinical Psychology Ph.D. Program**, Graduate Center – CUNY

Forensic Psychology Consultant:

> Advisory Board – Forensic Psychology Program/Behavioral Science Unit, Federal Bureau of Investigation
> Offices of the District Attorney & Legal Aid Society throughout New York State
> State of New Jersey, Offices of the Public Defender (various counties)
> U.S. Attorney's Office & Offices of the Federal Defender
> Law enforcement agencies in New York & Connecticut

> Forensic assessment services include: *competency for trial; criminal responsibility (insanity, extreme emotional disturbance, strict mens rea); capacity to waive Miranda rights; evaluation of mitigating & aggravating factors in capital sentencing cases; validity and trustworthiness of confessions; assessment of malingering; risk assessment/sentencing evaluations; police applicant, fitness for duty and critical incident evaluations; post conviction evaluations*

## PRIOR POSITIONS:

Consultant, NYPD - Developed instructional materials and led training workshops for Emergency Services Unit, funded by New York State Dept. of Mental Health, & New York City Dept. of Mental Health, Mental Retardation & Alcoholism (1986 -1990)

Consultant, NYPD Psychological Services Unit  (1977 - 1983)

Consultant, Power Authority of the State of New York - Evaluations of security staff and all personnel given access to Indian Point #3 Nuclear Power Station  (1981 - 1984)

Research Consultant and Member of Grant, Contract Review and Site Visit Panels, National Institutes of Health, Bethesda, Md.  (1972 - 1976)

Training Coordinator of Law Enforcement Assistance Association funded program to increase police effectiveness, Yonkers Police Department  (1972 - 1974)

Assistant Professor of Psychology, Department of Defense and University of Maryland, Nuremberg, West German  (summer, 1971)

Clinical Psychology Trainee, Veterans Administration Hospitals - Bronx, Montrose & Newark  (1967 - 1971)

## GRANTS, AWARDS AND HONORS:

2006 Distinguished Service Award to the Field of Forensic Psychology awarded by the American Board of Forensic Psychology at the annual meeting of the American Psychology-Law Society, St. Petersburg, FL, March 3

Fellow of the American Psychological Association, elected 2006

Board of Directors, American Board of Forensic Psychology (2006 – present)

Member, Board Certification Examination Committee, American Board of Forensic Psychology (1989 – present)

Member, Constitution Project Blue-Ribbon Committee on Mental Health Testimony in Alabama Capital Cases, (2001 - 2004)

Member, Continuing Professional Education Committee, American Psychological Association (2000 - 2003); Chair (2002 - 2003)

2000 Distinguished Continuing Education Seminar Speaker, American Psychological Association, Washington, D. C. national meeting of American Psychological Association

Member, Board of Trustees, American Board of Professional Psychology (1998 – 2005)

Editorial Board, *Behavioral Sciences & the Law* (1998 - present)

1997 Distinguished Contribution Award in the Field of Forensic Psychology awarded by American Academy of Forensic Psychology at American Psychological Association Annual Convention, Chicago

Member, Sponsor Approval System Review Committee  - American Psychological Association, (1997 – 1998)

Reviewer for Division 41 presentation proposals for APA annual conference (1996 - present)

Chair, Ethics Committee, American Board of Professional Psychology (1994 - 1996)

Editorial Board, *Criminal Justice & Behavior* (1994 - present)

Board of Directors, American Board of Forensic Psychology (1991 - 1998)

Member, Ethics Committee, American Board of Professional Psychology (1991 - 2002)

Chair, Continuing Education Program, American Academy of Forensic Psychology (1988 - 2006)

Board Certification in Forensic Psychology, American Board of Professional Psychology (1988)

Fellow, American Academy of Forensic Psychology (1988)

Principal Investigator and Administrator (1975 - 1977) of grants from:

| National Endowment for the Humanities | Exxon Foundation |
| Educational Foundation of America | Gallery Association |

Veterans Administration Traineeship in Clinical Psychology, Fordham University, (1967 – 1971)

Veterans Administration Research Award, Bronx VA Hospital, (1969 - 1971)

## MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS:

| American Board of Professional Psychology | American Academy of Forensic Psychology |
| American Psychological Association (Fellow) | |
| American Psychology-Law Society (Fellow) | |
| Westchester County Psychological Association | Eastern Psychological Association |

## SELECTED PUBLICATIONS AND PRESENTATIONS:

Goldstein, A. M.  Denial as a Function of Internal-External Control in Chronic Renal Failure. Unpublished Doctoral dissertation. Fordham University, 1971.

Goldstein, A. M. & Reznikoff, M.  Suicide in Chronic Hemodialysis Patients from an External Locus of Control Framework. *American Journal of Psychiatry, 127*, 1971, 124-127.

Goldstein, A.M. & Reznikoff, M.  MMPI Performance in Chronic Medical Illness: The Use of Computer-Derived Interpretations. *British Journal of Psychiatry, 120*, 1972, 157-158.

Goldstein, A. M.  *Psychological Abstracts*, 1971-1973.  Abstractor in area of psychosomatic medicine.

4

Fenster, C.A. & Goldstein, A.M.  The Emotional World of children *vis a vis* the Emotional World of Adults.  *Journal of Communication, 21*, 1971, 353-362.

Goldstein, A.M.  The Role of the Mental Health Professional in Chronic Medical Illness.  Paper presented at German-American Joint Annual Conference on Hemodialysis, The State Hospital, Nuremberg, West Germany, June 18, 1971.

Goldstein, A.M.  The Subjective Experience of Denial in an Objective Investigation of Chronically Ill Patients.  *Psychosomatics, 13*, 1972.

Goldstein, A.M. & Fenster, C.A.  The Role of the Mental Health Practitioner in Long-Term Medical Treatment.  *Psychosomatics, 14*, 1973, 153-155.

Goldstein, A.M.  Defense Mechanisms in Chronic Medical Illness.  *Essence: Issues in Death, Dying & the Process of Aging, 1*, 1976, 5-22.

Goldstein, A.M.  & Anderson, M.  A Model for Social Work Intervention in Thanatology.  Chapter in *The Role of the Community Hospital in Caring for the Dying*.  New York: Arno Press 1977.

Fenster, C.A., Blake-Klebanoff, L. & Goldstein, A.M.  Accuracy of Vocal Emotional Communications Among Children and Adults and the Power of Negative Emotions.  *Journal of Communications Disorders, 10*, 1977, 301-314.

Goldstein, A.M.  The Whole Truth: The Psychology of Person Identification.  *Contemporary Psychology*, 1979.

Goldstein, A.M.  Indirect Self-Destructive Behaviors in the Terminally and Chronically Ill.  Chapter in *Indirect Self-Destructive Behavior: An Exploration of Suicide*, N. Farberow, Editor, New York: McGraw Hill, 1980.

Goldstein, A.M.  *Managing Situations Involving Emotionally Disturbed Persons: A Police Training Manual* (Contributing author).  New York: New York City Department of Mental Health, Mental Retardation & Alcoholism Services, 1986.

Goldstein, A.M.  Contributing Editor for Forensic Psychology, *Clinicians' Research Digest*, (1985-1988).

Goldstein, A.M.  Psycho-legal and Ethical Issues in the Forensic Assessment of the Validity of Miranda Rights Waivers.  Postdoctoral seminar leader, Psychological Seminars, Inc., Dallas, Texas, 1987.

Goldstein, A.M. & Burd, M.  The Role of Delusions in Trial Competency Evaluations: Case Law and Implications for Forensic Practice.  *Forensic Reports*, 3, 1990, 361-386.

Goldstein, A. M.  Assessment of Criminal Responsibility: When Can We Look Backwards?  Paper presented at International Perspectives: Crime, Justice & Public Order, St. Petersburg, Russia, June 22, 1992.

Goldstein, A. M.  Forensic Assessment of Criminal Psycho-legal Competencies.  Postdoctoral continuing education workshop, sponsored by American Psychological Association at Centennial Convention of American Psychological Association, Washington, DC, Aug. 18, 1992.

Goldstein, A. M.  Competency to Confess: Evaluating the Validity of Miranda Rights Waivers and the Trustworthiness of Confessions.  Postdoctoral continuing education workshop, sponsored by American Psychological Association, National Convention of American Psychological Association, Toronto, August 22,1993.

Goldstein, A.M. (1993).  Careers in forensic psychology.  Chapter in *Mental Health and Social Work. Career Directory*.  New York: Visible Ink Press, Detroit.

Goldstein, A. M.  Forensic Assessment of Criminal Psycho-legal Competencies.  Postdoctoral continuing education workshop, sponsored by American Psychological Association at Convention of American Psychological Association, Toronto, Aug. 24, 1993.

Rogers, R., Sewell, K. W. & Goldstein, A. M. (1994).  Explanatory models of malingering: a prototypical analysis.  *Law & Human Behavior, 18*, 543-552.

Goldstein, A. M.  Competency to Confess: Evaluating the Validity of Miranda Rights Waivers and the Trustworthiness of Confessions.  Postdoctoral continuing education workshop, sponsored by American Psychological Association, Los Angeles, CA, Aug. 14, 1994.

Goldstein, A. M. Recent Developments in the Assessment of Criminal Psycho-legal Competencies.  Postdoctoral seminar sponsored by Sacramento Psychological Association, Sacramento, CA, Nov. 5, 1994.

Goldstein, A. M. & Moreland, K. L.  Detection of Malingering and Deception.  Postdoctoral   seminar sponsored by American Academy of Forensic Psychology, Portland, OR, Nov. 17, 1994.

Goldstein, A. M.  Ethical, Legal & Assessment Issues in Evaluating Child Custody and Termination of Parental Rights: Implications for Forensic Psychologists, Judges & Attorneys.  Training seminar for Carolinas Medical Center - Center for Mental Health, Charlotte, NC, Jan. 9 - 10, 1995.

Goldstein, A. M.  Basics of Forensic Psychology.  Postdoctoral continuing education workshop, sponsored by Wyoming and Colorado Psychological Associations, Cheyenne, WY, October 6, 1995.

Goldstein, A. M.  Role of the Forensic Psychologist.  Invited seminar presented on behalf of New York State Psychological Association & Northeastern New York Psychological Association, Mar. 22, 1996.

Goldstein, A. M.  Evaluating the Validity of Miranda Rights Waivers.  Invited seminar presented on behalf of Villanova School of Law & Hahnemann University, Philadelphia, Apr. 10, 1996.

Goldstein, A.M.  Help Wanted: Competent Expert – Knowledge of Ethics, Statutes, Research, Assessment, and Standard of Care Essential.  Invited address as recipient  of 1997 Forensic Psychology Distinguished Contribution Award, American Psychological Association convention, Chicago, August 16, 1997.

Goldstein, A. M.  Evaluating the Validity of Miranda Rights Waivers and Validity of Confessions: Law, Ethics and Assessment Issues.  Invited seminar, *Centro Caribeno de Estudios Postgraduados*, San Juan, PR, June 11, 1998.

Goldstein, A. M.  Ethics and Laws in Conflict.  Chair, symposium, American Psychological Association annual convention, San Francisco, August 14, 1998.

Goldstein, A. M.  An Introduction to Forensic Psychology.  Invited seminar, Duquesne University, Pittsburgh, PA, October 16 – 18, 1998.

Rogers, R., Salekin, R. T., Sewell, K. W., Goldstein, A. M., & Leonard, K.  (1998).  A comparison of forensic and nonforensic malingerers: a prototypical analysis of explanatory models.  *Law and Human Behavior, 22*, 353 –368.

Goldstein, A. M.  Evaluating mitigating and aggravating factors in capital cases: a seminar for attorneys.  Invited presentation by Clark County Office of the Special Public Defender, Las Vegas, NV, April 14, 1999.

Goldstein, A. M. Dimensions of competence in forensic psychology practice: core considerations. Symposium chair, American Psychological Association Annual convention, Boston, August 22, 1999.

Goldstein, A. M. Advanced Topics in Criminal Forensic Practice. Invited postdoctoral Seminar, American Psychological Association annual convention, Boston, August 23, 1999.

Goldstein, A. M. Ethical standards and the release of raw test data. Symposium Member, American Psychological Association annual convention, Boston, August 24, 1999.

Goldstein, A. M. Insanity. Invited presentation at American Bar Association/American Psychological Association national conference, Psychological Expertise and Criminal Justice, Washington, D.C., October 16, 1999.

Rühnke, D., Barrett, J., & Goldstein, A. M. Role of the forensic psychologist in death penalty mitigation. Postdoctoral continuing education workshop presented for the American Academy of Forensic Psychology, Tucson, AZ, April 5, 2000.

Goldstein, A. M. Advanced Topics in Criminal Forensic Practice. Invited postdoctoral seminar, American Psychological Association annual convention, Washington D. C., August 5, 2000.

Goldstein, A. M. Tools, tests and techniques: advances in forensic psychological assessment. 2000 Continuing Education Distinguished Speaker Seminar of the American Psychological Association, Washington, D. C., August 6, 2000.

Goldstein, A. M. Juvenile forensic evaluations. Panelist, Clinical Psychology Doctoral Program, Nova University, Fort Lauderdale, FL, September 20, 2000.

Goldstein, A. M. Tools, tests and techniques: advances in forensic psychological assessment. 36th Annual Deborah T. Creek Criminal Practice Institute, Gallaudet University Kellogg Conference Center, Washington, D.C., November 19, 2000.

Goldstein, A. M. Evaluating the validity of Miranda waivers and the validity of confessions. Invited lecture, Forensic Psychology Doctoral Program, Sam Houston University, Huntsville, TX, December 5, 2000.

Goldstein, A. M. Conducting ethical, competent assessments in capital cases. Psychiatry Lecture Series, University of Houston Medical School, Houston, TX, December 6, 2000.

Goldstein, A. M. Assessment of trial competence and malingering. Invited speaker, Office of the Federal Defender, San Juan, PR, January 8, 2001.

Goldstein, A. M. How death is different: Psychological evaluation and testimony in death penalty cases. Invited speaker, University of New Mexico School of Law, January 25, 2001.

Goldstein, A. M. Role of the psychologist in death penalty cases: law and practice. Invited speaker, 5th Annual Law and Psychology Lecture Series, Villanova University School of Law, March 22, 2001.

Goldstein, A. M. Review of *Youth on Trial*. *Journal of Psychiatry and Law*, 29, Fall 2001.

Goldstein, A. M., *et al.* A survey of forensic practice. Postdoctoral continuing education Seminar presented for the American Academy of Forensic Psychology, Washington D.C. (Sept. 30 - October 3, 1999); San Diego (Feb. 17 - 20, 2000); Tampa (Sept. 14 - 17, 2000); St. Louis (April 26 - 29, 2001); Seattle (October

18 - 21, 2001); Atlanta (Apr. 18 - 21, 2002); Minneapolis, (Oct. 3 - 5, 2002).

Goldstein, A. M., *et al.* Advanced forensic psychology practice: issues and application. Postdoctoral continuing education seminar presented for the American Academy of Forensic Psychology, Washington D.C. (Sept. 30 - October 3, 1999) & San Diego (Feb. 17 - 20, 2000); Tampa (Sept. 14 - 17, 2000); St. Louis (April 26 - 29, 2001); Seattle, (October 18 - 21, 2001); Atlanta (Apr. 18 - 21, 2002); Minneapolis (Oct. 3 - 5, 2002).

Goldstein, A. M. The role of the psychologist in death penalty litigation. Invited seminar, American Psychological Association, San Francisco, August 27, 2001.

Goldstein, A. M. Member, Editorial Board, *Criminal Justice and Behavior* (1994 - present)

Goldstein, A. M. Member, Editorial Board, *Behavioral Sciences and the Law* (1998 - present)

Goldstein, A. M. Forensic psychology: methodology and expert witness testimony. Invited talk, Philadelphia Neuropsychology Society, Nov. 2, 2002.

Goldstein, A. M. Miranda rights waiver case report and teaching point. In K. Heilbrun, G. R. Marczk, & D. DeMatteo, *Forensic mental health assessment: A casebook.* NY: Oxford University Press (2002).

Goldstein, A. M. Death penalty case report and teaching point. In K. Heilbrun, G. R. Marczk, & D. DeMatteo, *Forensic mental health assessment: A casebook.* NY: Oxford University Press (2002).

Goldstein, A. M. Ethical issues in forensic practice. Workshop for the American Academy of Forensic Psychology, Long Beach, CA, Jan. 15, 2003.

Goldstein, A. M. (Editor), *Forensic Psychology* (Volume 11) of *Handbook of Psychology.* NY: John Wiley & Sons (2003).

Goldstein, A. M. An introduction to forensic psychology. . Chapter in *Forensic Psychology*) Volume 11) of *Handbook of Psychology.* NY: John Wiley & Sons (2003).

Cunningham, M. D. & Goldstein, A. M. Forensic evaluations in capital cases. . Chapter in *Forensic Psychology* (Volume 11) of *Handbook of Psychology.* NY: John Wiley & Sons (2003).

Oberlander, L., Goldstein, N. E., & Goldstein, A. M. Competence to confess: evaluating the validity of Miranda waivers and trustworthiness of confessions. Chapter in *Forensic Psychology* (Volume 11) of *Handbook of Psychology.* NY: John Wiley & Sons (2003).

Goldstein, A. M., Morse, S, & Shapiro, D. L. Assessing criminal responsibility. Chapter in *Forensic Psychology* (Volume 11) of *Handbook of Psychology.* NY: John Wiley & Sons (2003).

Goldstein, A. M. Forensic psychological evaluation of specific intent, *mens rea*, and diminished capacity. Invited seminar for the State of New Mexico Department of Health, Behavioral Health Services Division. Albuquerque, June 27, 2003.

Goldstein, A. M., Thomson, M. R., Redding, R. E., & Osman, D. The role of research in forensic psychological testimony: Do judges listen? *Journal of Forensic Psychology Practice*, 3, 89 - 101, (2003).

Goldstein, A. M. Ethical issues in forensic practice. Invited two day seminar for Napa State Hospital, Napa, CA (December 11 - 12, 2003).

Foote, W. E. & Goldstein, A. M. An introduction to forensic psychology. Two day invited seminar for New Mexico Psychological Association, Albuquerque, Oct. 15 – 16, 2004.

Otto, R. K. & Goldstein, A. M. Juveniles' competence to confess and competence to participate in the juvenile justice process. Chapter in K. Heilbrun, N. E. Goldstein, & R. Redding (Eds.), *Current Perspectives on Juvenile Delinquency: Prevention, Assessment, and Intervention*, pp. 179-208. New York: Oxford University Press (2005).

Goldstein, A. M. Review of J. R. Eisenberg, *Law, Psychology, & Death Penalty Litigation*, *Psychiatry and Law*, *33*, 123-126 (2005).

Goldstein, A. M., Goldstein N. E., & Kalbeitzer, R. Assessing childhood trauma and developmental factors as mitigation in capital cases. Chapter in S. Sparta, & G. Koocher (Eds.), *Forensic Assessment of Children and Adolescents: Issues and Applications*, NY: Oxford University Press, 2006.

Goldstein, A. M. Assessing mental state at the time of the crime: insanity, *mens rea* and diminished capacity evaluations. Invited seminar, Tennessee Department of Mental Health & Disability Services, Forensic Evaluator Renewal Training, Murfreesboro, TN, May 25, 2005.

Goldstein, A. M. Ethical conflicts in forensic psychology. Invited seminar, Maine Department of Health & Human Services, State Forensic Training Program, Augusta, ME, July 15, 2005.

Goldstein, A. M. Best practices: Standards for forensic evaluations. Invited seminar, National Association of State Mental Health Program Directors, Annual Forensic Division Conference, Lake Tahoe, NV, September 12, 2005.

Goldstein, A. M. Achieving a standard of care in forensic mental health assessment. Invited seminar, Department of Law & Mental Health, Simon Frasier University, Barnaby, B.C., October 28, 2005.

Goldstein, A. M. (Ed.). *Forensic Psychology: Emerging Topics and Expanding Roles*. Hoboken, NJ: John Wiley & Sons, 2007.

Goldstein, A. M. Toward a standard of care. Chapter in A. M. Goldstein (Ed.) *Forensic Psychology: Emerging Topics and Expanding Roles*. Hoboken, NJ: John Wiley & Sons, 2007.

Krauss, D. A. & Goldstein, A. M. Federal sentencing guidelines and the role of the forensic mental health expert. Chapter in A. M. Goldstein (Ed.), *Forensic Psychology: Emerging Topics and Expanding Roles*. Hoboken, NJ: John Wiley & Sons, 2007.

Hielbrun, K., Marczyk, G., DeMatteo, D., & Goldstein, A. M. Toward informing a Standard of care in forensic mental health assessment: Legal, professional, and Principles-based considerations (submitted for publication).

Heilbrun, K., Grisso, T., & Goldstein, A. M. *Best Practices in Forensic Mental Health Assessment.: A Model for Forensic Practice*. NY: Oxford University Press (in preparation).

Goldstein, A. M., Goldstein Sevin, N. G. & Kassin, S. *Best Practices in Evaluating the Validity of Miranda Rights Waivers and Validity of Confessions*. In K. Heilbrun, T. Grisso, & A. M. Goldstein. (series Eds.). *Best Practices in Forensic Mental Health Assessment* (a 20 book series). NY: Oxford University Press, (in

preparation).

Heilbrun, K., Grisso, T., & Goldstein, A.M. (Series Eds.). *Best Practices in Forensic Mental Health Assessment* (a 20 book series). Oxford University Press, (in preparation).

Goldstein, A. M. & Otto, R. *Ethical Issues and Conflicts in Forensic Practice*, to be published by John Wiley and Sons (in preparation).