1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ---------------------------------------x
     UNITED STATES OF AMERICA,
3                   Plaintiff,

                                        CR 05-104
4


5            versus            United States Courthouse
                               225 Cadman Plaza East
6                              Brooklyn, N.Y.  11201
     SHAHAWAR SIRAJ MATIN,
7
                    DEFENDANT.
8
     ---------------------------------------x
9
                                    January 8, 2007
10                                  4:10 p.m.
              TRANSCRIPT OF SENTENCE
11   Before:  HON. NINA GERSHON,
                             DISTRICT COURT JUDGE
12
                      APPEARANCES
13
     ROSLYNN R. MAUSKOPF
14   United States Attorney - Eastern District of New York
     One Pierrepont Plaza
15   Brooklyn, New York  11201
             TODD HARRISON, ESQ.
16           MARSHALL MILLER, ESQ.
     Assistant United States Attorneys
17

18   ATTORNEY FOR DEFENDANT:

19   MARTIN R. STOLAR, ESQ.
     KHURRUM BASIR WAHID, ESQ.
20   SEAN MICHAEL MAHER, ESQ.

21   Court Reporter:  ALLAN R. SHERMAN, CSR, RPR
                      225 Cadman Plaza East Rm 374
22                    Brooklyn, New York  11201
                      Tel: (718) 260-2529  Fax: (718) 254-7237
23


24

25   Proceedings recorded by mechanical stenography, transcription
     by CAT.
           ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
           United States District Court  Eastern District of New York

1          THE CLERK:  Criminal cause for sentencing, United

2    States of America versus Shahawar Siraj Matin, docket number

3    CR 05-104.

4          MR. MILLER:  Marshall Miller and Todd Harrison for

5    the government.

6          MR. STOLAR:  For the defendant, Martin R. Stolar,

7    Khurrum Wahid and Sean Michael Maher.

8          MR. GJELAJ:  Mark Gjelaj for the probation

9    department.

10          THE COURT:  Counsel, the first thing I want to do is

11    ask Mr. Matin whether he read the presentence report and the

12    addendum to the presentence report?

13          THE DEFENDANT:  Yes, your Honor, I did.

14          MR. STOLAR:  I don't believe he read the addendum

15    because I didn't have it.  Somehow it didn't get E-mailed to

16    me.  I picked it up today.

17          THE COURT:  Let's take a moment and let me go over

18    it with him.

19          MR. STOLAR:  I don't think that it's very

20    significant.

21          THE COURT:  He has the right to read it and discuss

22    it with his attorney and I think it's important that we take

23    care of that.

24          (Pause.)

25          THE COURT:  Mr. Matin, have you now had an

1  opportunity to read the addendum and to discuss it with your

2  attorney's?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  And you discussed the presentence report

5  itself with your attorneys?

6          THE DEFENDANT:  Yes.

7          THE COURT:  In addition to those documents, I have

8  also reviewed the following documents; a letter from Mr.

9  Stolar dated December 21, 2006 which contained various

10  attachments, including letters in support of the defendant

11  from his family and associates and a psychologist's report.

12  Also I reviewed the letter from Mr. Stolar dated

13  November 23rd, 2006 to the probation department.

14          In addition, I had letters from the government dated

15  November 9, 2006 and December 4 and 29th, 2006.

16          Is there anything else that should have been in my

17  file?

18          MR. HARRISON:  No, your Honor.

19          MR. STOLAR:  That is the same file that I have in

20  front of me, judge.

21          THE COURT:  Very good.

22          Well then with respect to the presentence report,

23  counsel have addressed at some length the issues of

24  obstruction of justice and acceptance of responsibility which

25  of course affect the guidelines and I will rule on those

1 │ issues.

2 │        For now, I want to just ask whether there are other

3 │ issues regarding the presentence report that counsel wish me

4 │ to address.

5 │        In my view, there aren't any other issues that would

6 │ affect the sentencing.

7 │        MR. STOLAR:  With respect to the guidelines

8 │ calculations, those are the only two open issues.  Otherwise

9 │ the calculations are as called for by the guidelines.

10 │        THE COURT:  Is there anything else that is in the

11 │ PSR that you feel you need a ruling on?

12 │        MR. STOLAR:  No, judge.

13 │        THE COURT:  Then with respect to the request for the

14 │ obstruction of justice enhancement based upon perjury, I'd

15 │ like to hear counsel's views on the standard of proof that the

16 │ government must meet to prove perjury for sentencing purposes.

17 │        In the past when dealing with this issue in other

18 │ cases, I've applied a clear and convincing evidence standard

19 │ based on cases such as United States versus Kelly, 147 F.3rd

20 │ 172 at 178 which is a Second Circuit case of 1998.

21 │        However, in preparing for today's sentencing I

22 │ noticed that there are recent Second Circuit cases which

23 │ without saying that the earlier cases are incorrect, describe

24 │ the standard as preponderance of the evidence.  For example,

25 │ one case is United States versus Agudelo, 414 F.3d 345.  And

1  I'm just asking if counsel wish to address this or have any

2  enlightenment on that subject.

3          MR. STOLAR:  I would have thought that the standard

4  should be clear and convincing evidence.  If you are going to

5  find that someone who took the witness stand and testified in

6  his own defense differs in his recollections about things that

7  happened from somebody who testifies for the government, that

8  can be a difference in recollection.  It does not necessarily

9  have to be perjury.  So it has to be I would think by a clear

10  and convincing standard, not merely a preponderance.

11          MR. HARRISON:  Judge, there are recent cases in the

12  Second Circuit as the Court points out that set a

13  preponderance standard.  Frankly, in this case it's the

14  government's position that under either standard we have

15  proven in fact that that does apply.

16          This isn't a case of just simply a difference in

17  recollection.  As we've laid out in the papers and as the PSR

18  talks about, the defendant's testimony both at the suppression

19  hearing and during the trial, throughout the trial was just

20  clearly, flatly contradictory to a number of other witnesses'

21  testimony, specifically the undercover officer as well as the

22  CI.

23          And we have talked about that in our papers.  So

24  frankly, I think under either standard the government has met

25  it.

1          MR. STOLAR:  Judge, the problem is that it has to be

2     dealing with something that is extremely material to the case.

3     And what was material here was Mr. Matin's admission that;

4     yes, he was part of the conspiracy to blow up the 34th Street

5     subway station.  That is the material aspect of it.  Other

6     things not necessarily material but the central argument, the

7     central basis of the defense that he essentially was talked

8     into doing this, has not been contradicted by anybody except

9     the confidential informant obviously.

10         Obviously there is a difference in perspective and

11    he sees it from his own subjective perspective and he

12    shouldn't be punished for taking the witness and testifying

13    about his subjective perspective.

14         MR. MILLER:  First, with respect to materiality,

15    there could be nothing more material to this case at both the

16    hearing and the trial than the false statements that the

17    defendant made.  At the hearing, the goal of the hearing from

18    the defendant's perspective was to suppress statements.  His

19    changing story, from time to time changing was intended to

20    induce your Honor to suppress those statements.

21         Just to take one example, his argument, his

22    testimony that he believed that Mr. Harrison was his attorney

23    didn't come out of a vacuum and it wasn't immaterial.  It was

24    directly material.  He felt that were he to prevail on your

25    Honor to find that was the indeed the case, the statements

1  would be suppressed.

2          Similarly at the trial his false statements with

3  respect to his own opinions, his own affinity for, his own

4  support for terrorist activity or the lack thereof as he

5  testified initially were false and intended to induce the jury

6  to find that he was in fact a person who was innocent, he was

7  a person who didn't have the violent tendencies that indeed he

8  really did have, he was a person who wasn't interested in and

9  supportive of terrorist activity before he met the CI.

10          He did so in order to induce the jury to come back

11  with a not guilty verdict based on his defense.  So there is

12  nothing that could possibly be material than the false

13  statements that the defendant made both at the hearing and at

14  the trial.

15          With respect to the argument that counsel pulls out

16  of the air that there is nothing to contradict the defendant's

17  statements with respect to what happened, everything at the

18  trial contradicted what the defendant said about what happened

19  between him and the CI, not just the CI but the testimony of

20  the undercover completely subverted his initial testimony as

21  to what his character was like prior to meeting the

22  confidential informant, which as your Honor noted in the

23  recent opinion, was the basis of his defense.

24          Mr. Elshafay completely contradicted the defendant's

25  testimony, the tapes an the absence of any statements that

1      would possibly support what the defendant alleged, the fact

2      that dozen of hours of conversations where these individuals

3      spoke together, the two of them and the three of them, at

4      length about the plot, about where it came from, and the fact

5      there was not a single instance where there was any reference

6      to what the defendant testified at trial is also contradictory

7      of the defendant's statements.

8              So the idea that no one by the CI contradicted the

9      defendant is just not true, is not factual.

10             So with respect to both of those issues, the

11     government believes, as Mr. Harrison already pointed out, that

12     under either standard, the standard has been met at both the

13     hearing and the trial.

14             THE COURT:  Anything else on the standard?

15             MR. STOLAR:  No, judge.

16             THE COURT:  I do think that the appropriate standard

17     for this enhancement where it's based on the perjury of the

18     defendant is the clear and convincing standard and that is the

19     standard I will apply and I'll make my rulings with regard to

20     that later.

21             So at this point I'll hear from the defense counsel

22     with respect to sentencing and from the defendant and then the

23     government.

24             MR. STOLAR:  Judge, it seems to me that the question

25     before you is whether you are going to sentence an individual

1    or you are going to sentence an image, whether you are going

2    to sentence a real person or some kind of mirage that has been

3    created, whether you are going to sentence a human being or a

4    symbol.  And the submission we made to you is that it is a

5    real human being that you are sentencing.  It is not somebody

6    who is a symbol of terrorism, it's not somebody who as the

7    NYPD would like to think, they have created a crime so they

8    can could solve one so they could establish their duty in the

9    war on terrorism.  That is not who Matin is.  That is not the

10   individual he is.  He is somebody who by the objective testing

11   of the forensic psychologist and by the grades that you can

12   see in the attachment that he achieved in school, he is at the

13   lower end of intelligence.  This is not something that he

14   would have come up with by himself.  There was a two-year

15   period when he had contact with both the confidential

16   informant and the undercover officer where nothing happened,

17   regardless of whether he made statements or not, whether were

18   political statements or opinion statements.  Nothing happened

19   during that two year period.

20          It wasn't until April from our point of view of 2004

21   that finally something happened and started going.  We still

22   insist that he never would have done anything by himself had

23   it not been for the man who was twice his age who was

24   preaching to him about Islam and the duty of somebody who is

25   becoming more traditional Islamic, it never would have

1    happened, nothing would have happened.

2           So this is somebody who is at the lower end of the

3    scale of intelligence.  He is an immature young man.  He is

4    now 24 years old.  He was 22 when this all started.  And if he

5    is out with his buddies like Kamil Pasha of the same age,

6    basically doing trash talking, and that's what all the kids

7    hanging around do, they trash talk.  So that's where we are

8    at.  He is not somebody who is a terrorist.  That is just not

9    the person you are sentencing.

10          And in fact, as you know from the videotape, he was

11   going to try to get out of this.  He was withdrawing at the

12   end.  That is what he said.  That was on the videotape.  I'm

13   going to have to ask my mother for permission or my father for

14   permission.  That hardly sounds to me like a terrorist.

15          So the picture that is painted of the person who you

16   are sentencing is painted I think in the submission that we've

17   made, in the letters of people who know him, who know him to

18   be an immature and easily manipulated young man, in the

19   forensic psychologist's report which the government basically

20   says is wrong.  Nobody can buy Allan Goldstein.  He is as

21   objective as they come, particularly in a case like this.  And

22   what his findings are based on the testing that he did

23   consistent with the low school grades.  And the person that

24   you saw testify who was not, as I've said on prior occasions,

25   not the brightest light bulb in the chandelier, that's who you

1   have before you.  You don't have somebody who is a committed

2   terrorist.  And the sentence ought to take into account who

3   the individual is and that is the submission that we have

4   made.  And I think under 3553(a), regardless what the

5   guidelines say, you sentence a young man, you don't sentence

6   somebody who is a symbol of the war on terror because that's

7   not who he is.

8              That is my argument, judge.

9              THE COURT:  Thank you.

10             Mr. Matin, is there anything you would like to say

11  to me directly with regard to sentencing?

12             THE DEFENDANT:  I want to apologize first to you for

13  all the recording that we listen in my trial.  Your Honor, I

14  want to apologize about whatever I said in the tapes.  I wish

15  I can take those words back but it cannot happen.  I already

16  said those things and at the time when this happened, it is

17  true that this person, if the CI never comes in my life, I

18  never ever do this thing.  In the end, I told him many things.

19  I told him I don't want to do it but he keep on telling me;

20  you don't want to do it, what about last time?  What are you

21  going to do in the future?  I don't remember exactly

22  everything but certain things are recorded in the tape with

23  this last conversation with the individual.  I told him clean

24  that, Mr. Eldawoody that I don't want to do it because of the

25  people who were going to die over there.  And that is on the

1   tape.  I told him I will ask my mother's permission.  That is

2   on the tape.  He says over there clean about the -- about

3   certain things that oh, what about you want me to call

4   Mr. Abdul Hakim and tell him that you don't want to do it.  I

5   told him go tell him, I don't care.  Because there are a lot

6   of general conversation that is not recorded previously in

7   April and March, long before which is more or less general

8   talking, but there were certain times that Mr. Eldawoody did

9   say to me certain things about if you are not going to go with

10  these people, this will happen to you; if you do not go with

11  these brothers if you are join them and you are not going to

12  do with those brothers and you deny it at the end, that will

13  be the problem.

14          So I apologize for all the stuff that I said on

15  those tapes, your Honor.  The conspiracy did happen.  34th

16  Street was spoken by me and I already tell them that I'm

17  taking the responsibility of 34th Street, that that conspiracy

18  did happen and I'm taking that responsibility of 34th Street

19  subway station.  But I was manipulated by this person.  If

20  this person never came in my life, I never do this.  And I

21  apologize to Mr. Harrison and Mr. Miller and the jury if they

22  were present.

23          That is it, your Honor.

24          THE COURT:  Mr. Harrison.

25          MR. HARRISON:  Just briefly, I'll make a couple of

1   points then Mr. Miller will take over.

2           No one is asking the Court to sentence the defendant

3   as some sort of symbol.  We're asking the Court to sentence

4   the defendant as someone who has in fact committed a crime,

5   and frankly, as we heard, someone who has not taken

6   responsibility for that crime and it was a very serious crime.

7           This defendant is not at the low end of

8   intelligence.  The defendant testified before you twice.  He

9   was very calculating in his testimony frankly.  He saw where

10  Mr. Miller and I were trying to go in cross-examination and he

11  tried to get there before us.  He played off of his defense

12  attorney's objections at trial.  He could read where the

13  defense attorney wanted him to go.

14          This individual, the defendant, is certainly not at

15  the low end of the intelligence scale.  As you saw from his

16  testimony, he is very calculating.  During the course of the

17  crime the defense wants to sort of relitigate the case now

18  when the case has been proved not only beyond a reasonable

19  doubt but beyond any doubt.

20          During the course of the crime the defendant came up

21  with a plan to attack Staten Island.  He came up with a plan

22  to attack the Verrazano Bridge.  He was later involved in

23  bringing James Elshafay who he knew wanted to carry out a

24  terrorist attack together with the confidential informant who

25  he believed to be part of a brotherhood who could provide

1   explosives.  He did that.  The defendant on his own carried

2   out reconnaissance of 34th Street Herald Square subway

3   station.  Nobody told him to do that.  The defendant on his

4   own came up with a plan to bomb the 34th Street Herald Square

5   subway station.  Nobody told him to do that.

6          The defendant on his own drew a diagram of the 34th

7   Street Herald Square station and where to place a bomb in that

8   station and in direct contradiction to the defendant's

9   protestations of innocence and not wanting to hurt anyone, the

10  jury and the Court heard plain as day on those tapes that the

11  defendant, although he did say that he wanted to try not to

12  kill people, he was perfectly willing to have people die,

13  homeless people, other people who might be on the train when

14  the bomb went off, and that was clear as day on the tape.

15  This was not an individual who had no idea what was going on.

16  This is an individual who was calculating and knew exactly

17  what was going on and was the initiator of almost all of the

18  steps, I guess you could say all of the steps frankly, of the

19  actual crime, a very serious crime, planning to place a bomb

20  in one of the most crowded subway stations in New York City.

21  To try and brush that off and pretend that it was trash talk

22  as counsel says is frankly ludicrous.  And I understand he has

23  a job to do but how could anyone have listened to all of those

24  tapes talking about wanting -- serious plans for wanting to

25  place a bomb on a crowded subway, talking about how they were

1    delighted in 911, talking about how they hope that Osama Bin

2    Ladin struck again, all the statements that the defendant made

3    even prior to that, even prior to his ever meeting the

4    confidential informant to the undercover officer.  And I'm not

5    going to go through all of them.  We have gone over them again

6    and again and we have heard the defendant's own voice

7    repeatedly talking on the tape about how he wanted to place a

8    bomb and do violence to the economy of New York City for his

9    political objectives.  This defendant does not lack

10   intelligence.  He was calculating, knew what he was doing.  He

11   was the initiator of this plot.

12          MR. MILLER:  Your Honor, to follow up on what Mr.

13   Harrison said.

14          With respect to the seriousness of the crime, it's

15   hard to imagine a more serious or dangerous conspiracy crime

16   than the one the defendant is charged with and the defendant

17   has been convicted of.

18          And what is interesting here is that there is an

19   effort on the part of the defense to spin this as somehow the

20   testimony of the CI was the critical moment in this trial and

21   that was the critical evidence.  But the evidence of the

22   crime, the evidence of the crime itself comes from the

23   defendant's mouth.  The government isn't trying to spin some

24   image of someone who was plotting to commit a terrorist

25   attack.  The defendant plotted to commit a terrorist attack

1  right in this courtroom and we heard him do it and that it was

2  he who was the driving force, the moving force behind this

3  plan.  He came up with the plan.  He plotted to bomb various

4  locations within New York City.  He honed the plan down to the

5  34th Street subway.  He chose it.  He was the moving force all

6  the way up to the arrests on the eve of the execution of the

7  plot.

8           Now, focusing then also on his role in the offense,

9  which is also a critical issue for your Honor to think about

10 in sentencing, this attack was really his brain child.  As I

11 just said, he chose the station, he chose the place within the

12 station where the bomb should go.  He went and looked at every

13 angle again and again to get just the right location.  He was

14 the one who decided how the bombers should dress.  He was the

15 one who provided the information about where the bombers

16 should enter the subway station, how they should walk through

17 it, where they should plant the bomb and exit it.  He was the

18 one who timed how quickly the subways came so they could come

19 up with a getaway plan, how long was it going to take for the

20 next subway to come to they can leave the bomb, get away

21 before the detonation happens.

22          It shows the important driving role that he plays

23 within the organization, but these are not the kinds of

24 questions and the kinds of issues and the kinds of complicated

25 analyses that are done by someone of the level of intelligence

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

1   that is in the report and that is being proffered by the

2   defense.

3            They can say all they want that he has lower

4   intelligence but everything we have seen at the trial from his

5   complex strategies and plans for bombing things to his

6   testimony at trial belie that argument that he is somehow not

7   intelligent.  It's just not the case.  And as Mr. Harrison

8   mentioned, this attack, this plot was really his handy work.

9   If you think about it, he really did every single thing that

10  happened with respect to this plot.  James Elshafay came up

11  with some initial idea which he then honed down to something

12  that he brought to the CI.  Every other step thereafter was

13  the defendant's step.  He was the visitor to the location.  He

14  came up with the ideas.  All he did was come to the CI and say

15  can you give me the explosives to make this thing happen.  And

16  the CI at the direction of law enforcement continued that

17  role.  Of course, he adopted that role.  That's what you would

18  want law enforcement to do.

19           Here is a guy with a complex plan and another guy

20  who is willing to bomb something approaching a government

21  informant and saying can you get explosives to make this thing

22  happen.  Of course, the CI says yeah, I can get you explosives

23  to make sure that he doesn't go somewhere else and find

24  somebody who would give him explosives and could give him

25  explosives.  That's what the CI did.  What the defendant did

1  was every other thing that relates to this plot.

2          In fact, as he was explaining this complex plot to

3  the CI and to Elshafay, he was frustrated by the fact that

4  they didn't get it, they weren't up to speed with him, they

5  couldn't keep up with him.  He was the one that knew the

6  subway station.  He even drew a map for the CI so he would

7  understand it.  He admitted on cross-examination that he

8  really didn't get it so he took them on a field trip to show

9  them the location so that they could scout it out so that they

10  could get it done.  He led them there, showed them around and

11  then they did a second map.

12          The role of law enforcement seems to be an issue

13  that the defense tried to bring up here.  The fact that law

14  enforcement intercepted this plot at an early stage, the fact

15  that the defendant brought his idea to someone who happened to

16  be an informant for the NYPD doesn't make the conspiracy crime

17  any less serious or the defendant any less culpable.  It just

18  means that law enforcement did its job.

19          And it's a red herring to try to turn this case into

20  some sort of referendum.  I would suggest that the defense is

21  trying to make this case into a symbol about law enforcement.

22          From the government's perspective, this is a

23  sterling example about how law enforcement should work and

24  bring cases through the criminal justice system; develop

25  evidence, present it to the jury, then present the case to

1    your Honor, achieve a conviction and then let your Honor

2    deliver the sentence that is just.

3            But putting that aside, it doesn't really matter

4    whether it's a model example of law enforcement or not a model

5    example of law enforcement.  What matters is that this

6    defendant was caught on tape committing a incredibly serious

7    crime and being the driving force behind that crime.

8            Finally, with respect to protecting the public,

9    another critical issue for your Honor to decide, it's not very

10   often that you come to court to engage in a sentencing where

11   the defendant has expressed in his own words in a natural

12   course of conversation but happened to be caught on a tape

13   that he intends to remain committed to violent Jihad until the

14   day he dies a martar's death during a terrorist attack.

15   That's what we have here.  This is the situation.

16           Now, the defense can call it trash talk all they

17   want but we have the defendant speaking to his friend making

18   that statement.  And for that reason, your Honor, I think that

19   a sentence within the sentencing guidelines is an appropriate

20   steps on that element, that is with respect to protecting the

21   public.

22           Finally, your Honor, the sentencing guidelines, when

23   appropriately applied as they will be in this case and in this

24   case based on all the facts in this case in the government's

25   view recommend a sentence for the crimes that the defendant

1　has been convicted of, that is 30 years to life and we ask

2　that the Court sentence the defendant within that range.

3　　　　　THE COURT:  Anything else?

4　　　　　MR. HARRISON:  No, your Honor.

5　　　　　MR. STOLAR:  It's just a very different view of the

6　trial evidence, a very different view of the individual who is

7　in front of the Court.  He is not a symbol of terrorism and he

8　should not be sentenced as such.

9　　　　　THE COURT:  If there is nothing further, I will

10　proceed to make my findings relative to the sentencing and

11　then impose sentence.

12　　　　　First, with respect to the obstruction of justice,

13　the government requests a two level adjustment for obstruction

14　of justice under Guideline Section 3C1.1 based upon

15　defendant's false testimony at both the suppression hearing

16　and at trial.

17　　　　　I find by clear and convincing evidence that the

18　enhancement applies.

19　　　　　First, with respect to the suppression hearing, the

20　issue at the suppression hearing was whether the defendant's

21　confession to law enforcement should be suppressed.

22　　　　　Following an evidentiary hearing, this Court denied

23　the motion in an opinion that is reported at 424 F. Supp 2nd

24　509.  As is clear from that opinion, there were numerous

25　instances in which the Court did not credit the defendant's

1    testimony.  The issue here, however, is whether the Court

2    finds that the defendant willfully obstructed justice.  It's

3    not enough to find that I didn't credit his testimony.

4         I do, however, in fact further find that the

5    defendant willfully attempted to obstruct justice.

6         Two examples will suffice.  One involved efforts on

7    the part of the defendant to show a basis for suppression of

8    his confession.  They therefore are material.  Application

9    note six to the guideline defines material information as

10   information which, "If believed would tend to influence or

11   affect the issue under determination."

12        The first such willful false statement was the

13   defendant's testimony that he believed that one of the

14   assistant United States Attorneys who was present at the

15   interview during which he confessed was his own attorney.

16        Obviously, the point of this testimony was to

17   suggest that he described his role in the crimes because he

18   thought he was in the presence of his own attorney.

19        At page 512 in footnote three of the reported

20   decision on the suppression motion, I identified in detail all

21   the reasons I found that the defendant's testimony was

22   untruthful and I incorporate those findings hear.

23        I now further find, as required for the enhancement

24   by clear and convincing evidence, that the testimony of the

25   defendant was willful and intentionally false and was not the

1    result of an honest mistake or confusion or a faulty memory.

2           The second perjurious statement which I rely on here

3    was that the defendant was handcuffed throughout the

4    interview.

5           That testimony occurred at pages 125 to 126 of the

6    January 24, 2006 transcript.  Again, I not only find that this

7    testimony was false but also that it was willfully and

8    intentionally so and not the result of an innocent mistake.

9    That the testimony was false is based upon my observations of

10   the defendant whose testimony generally lacked candor, was

11   evasive, contradictory and opportunistic, that is, he was

12   frequently willing to say whatever would appear to help him at

13   the moment.

14          At the suppression hearing I credited the testimony

15   of other witnesses who testified that according to standard

16   procedure, the defendant was uncuffed during the interview.

17   The defendant's false testimony in this regard was clearly

18   material.  Had I credited it, it would have lent support to

19   the defendant's claim that his confession was involuntary and

20   coerced.

21          The government also argues that numerous of

22   defendant's statements at the trial were willfully and

23   materially false.  Of course, merely because the jury rejected

24   the entrapment defense does not mean that a defendant's

25   testimony in support of such a defense constitutes perjury.

1          Here, however, the testimony of the defendant in

2    support of that defense included specific and I find

3    deliberate lies.  It was a central tenet of the defense and a

4    central part of the defendant's direct testimony that he was a

5    non-violent person who did not support violent conduct or

6    terrorist activity.

7          Among other things, he testified that he had never

8    expressed support for terrorism or terrorist activities or for

9    Osama Bin Ladin before he met the confidential informant.

10          See for example the trial transcript at pages 2774

11    to 2780.

12          The government relies on the rebuttal testimony of

13    the undercover officer to prove the falsity of these

14    statements.  The credibility of the undercover was

15    established.  I have no reason based upon his testimony, his

16    demeanor or the evidence as a whole to discredit the

17    undercover's testimony as to what the defendant said to him.

18    In contrast, the defendant once again was evasive,

19    contradictory and generally lacking in credibility.

20          And I note the case United States versus Onumonu 999

21    F.2d 43, which is a Second Circuit case from 1993 which held

22    that the somewhat nicknamed two witness rule which was

23    applicable in a criminal perjury conviction is inapplicable to

24    a perjury enhancement under guideline 3C1.1.

25          According to the credible testimony of the

1    undercover officer, prior to meeting the confidential

2    informant the defendant had regularly expressed support for

3    violent terrorist acts and his support for Osama Bin Laden and

4    Al Qaeda and their terrorist actions.

5                See, for example, the trial transcript at pages

6    3312, 3327 to 3328.

7                Because the defendant's false statements were

8    directed at convincing the jury that he had been induced to

9    commit the crimes by the confidential informant, they were

10   material.  The defendant's alleged non-violent nature was

11   material because the defendant's defense hinged on his claim

12   that only after he met with the confidential informant and

13   only because the confidential informant inflamed his anger

14   against America did he harbor violent thoughts against America

15   and seek to harm its economy.

16               Proof that the defendant had harbored and only

17   expressed such thoughts before the time he was allegedly

18   induced by the confidential informant directly rebutted this

19   claim.  The issue was therefore very material to the outcome

20   of the trial.

21               In sum, by clear and convincing evidence I find that

22   the defendant lied at the trial with the wilful intent to

23   persuade the jury rather than as a result of confusion,

24   mistake or faulty memory or some other innocent reason.

25               This effort to persuade the jury as to a key part of

1    his defense amounted to a willful attempt to obstruct justice.

2    The sentence guideline issue is that the defense argues that

3    even though the defendant put the government to its proof at

4    trial, he is nonetheless entitled to a two level downward

5    adjustment for acceptance of responsibility because: "He

6    admitted that the 34th Street plan was his and he was an

7    active coconspirator."

8           To begin with, an acceptance of responsibility

9    adjustment is ordinarily not available to a defendant who puts

10   the government to its proof at trial.  It is also ordinarily

11   and understandably unavailable where a defendant is found to

12   have obstructed justice.  And that he is set forth in the

13   guidelines 3E1.1 and the accompanying notes to that guideline.

14          The government's proof of the defendant's knowing

15   participation in the four conspiracies charged was

16   overwhelming and the only theory of defense was entrapment.

17   The defendant did not clearly demonstrate his acceptance of

18   responsibility.

19          On the contrary, his efforts to deny responsibility,

20   despite acknowledging that the 34th Street bombing plan was

21   his plan were both vigorous and false.  Thus, it's unnecessary

22   for me to decide the issue which is apparently unresolved in

23   this Circuit whether a defendant offering an entrapment

24   defense could ever be given an acceptance of responsibility

25   adjustment.  See United States versus Rosa, 17 F.3d 1531,

1  Second Circuit 1994, Cert denied 513 U.S. 879.

2      I'm going to turn then to the guidelines

3  calculation.  It's undisputed that the base offense level is

4  24 and that 12 additional levels are added as described in the

5  presentence report.  In addition, I will add two levels for

6  obstruction of justice based upon the defendant's perjuries

7  that I have just discussed.  I note that any one of the

8  perjuries would warrant an enhancement.  Thus, the guidelines

9  three is 38.

10      It is also not disputed that the criminal history

11  category is six because of the nature of the crime.  And that

12  is pursuant to guideline 3A1.4(b).

13      The sentencing range under the guidelines is

14  therefore 30 years to life imprisonment.  The government asks

15  that a sentence within the guideline range be imposed.  The

16  defense asks that a lower sentence be imposed.

17      Based upon all of the factors that are set forth in

18  18 U.S. Code Section 3553, including the guidelines, I

19  conclude that a sentence within the guidelines range is

20  appropriate.

21      The crimes committed here were extraordinarily

22  serious.  They had the potential if not thwarted to wreak

23  havoc with New York City's public transportation system,

24  indeed with the tristate area's transportation system as was

25  established by the trial evidence.

1          This would have meant enormous economic loss both to

2    public and private entities in the area and great disruption

3    to the lives of those who use the public transportation

4    system.  Even more importantly, the potential for loss of life

5    in the bombing of a major subway station sitting as it does

6    under a large shopping area is obvious.  Indeed, that was

7    known to the defendant.

8          While the defendant stated that his goal was to

9    damage the economy, he acknowledged knowing that even if the

10   bombs were exploded at a relatively quiet time in the station,

11   innocent people would likely be killed.

12         The defendant's role in the bombing plot was

13   central.  He initiated the plan and brought it to the

14   cooperating codefendant and the confidential informant.  He

15   repeatedly scouted the station to determine where best to

16   place bombs and how to avoid detection.  He even planned how

17   the conspirators should dress and what exits and entrances to

18   use.  His attempts now to minimize both the crimes and his

19   role in them is not persuasive.

20         Under all of the circumstances, I now sentence the

21   defendant within the guideline range to 30 years in prison.

22   This sentence will be sufficient to serve as both punishment

23   and deterrence to the defendant and to others.

24         Thus, technically the sentence will be as follows:

25   On counts one, two and three concurrent terms of 20 years in

1    prison, which is the statutory maximum for each of those

2    counts.  And on count four a concurrent term of 30 years.

3            With respect to supervised release, the defendant is

4    sentenced to three years concurrent terms of supervised

5    release on counts one, two and three and a concurrent life

6    term of supervised release on count four.

7            As a special condition of supervised release, if the

8    defendant is deported, he is not to illegally reenter the

9    United States.

10            No fine is imposed as the defendant appears unable

11    to pay a fine.  And finally, there is a mandatory 400-dollar

12    special assessment.

13            The defendant is advised of his right to appeal.

14    And I believe there are no open counts.  The only issue would

15    be if the defense wishes to make an application for a

16    designation.

17            MR. STOLAR:  Yes, I would ask that you recommend to

18    the Bureau of Prisons that he be designated to an institution

19    in the northeast region.

20            THE COURT:  I will do that.

21            MR. MILLER:  This is an underlying indictment.  The

22    defendant was convicted on a superceding indictment.  So with

23    respect to the underlying indictment, the government would

24    move to dismiss any open counts.

25            THE COURT:  The application is granted.

1          MR. STOLAR:  I would also ask that you request that

2   the Bureau of Prisons keep him in the New York area at least

3   for the next two months so that he can consult with appellate

4   counsel.

5          THE COURT:  I'm not going to make that specific

6   recommendation.  I can certainly recommend a designation in

7   general but I don't really know what the Bureau of Prisons

8   policy is with respect to that.

9          MR. STOLAR:  For appellate purposes they will often,

10  if the Court directs, keep the person here beyond the four to

11  6 weeks it takes to designate an institution.

12         THE COURT:  Are you talking about being kept in the

13  MDC rather than being designated?

14         MR. STOLAR:  Yes.

15         THE COURT:  You are asking that he be held at the

16  MDC?

17         MR. STOLAR:  For at least for a couple of months so

18  that he can confer with appellate counsel.

19         THE COURT:  Counsel, do you have any idea whether

20  that is a reasonable thing?

21         MR. HARRISON:  No, and I am reluctant to agree to

22  anything.  If the Mr. Stolar wants to make the motion, perhaps

23  a schedule with a response from the Bureau of Prisons would be

24  appropriate.  In the absence of that, your Honor, we would

25  oppose it.

1           THE COURT:  Counsel, I'm just concerned.  I don't

2      know.  Normally people want to leave the local facility and I

3      don't really know what the issues are at the MDC for sentenced

4      prisoners.

5           So I think Mr. Miller makes a good point.  If there

6      is any further application, probably you ought to make that

7      with the Bureau of Prisons.

8           Anything else?

9           MR. STOLAR:  Nothing else.

10          MR. MILLER:  No, judge.

11          MR. HARRISON:  No, judge.

12          (Matter concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25