**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x

**UNITED STATES,**

**-against-**

**SHAHAWAR MATIN SIRAJ,**

**Defendant.**

------------------------------------------------------------ x

**OPINION & ORDER**

**05-cr-00104 (NG)**

**GERSHON, United States District Judge:**

Defendant moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). For the reasons that follow, Mr. Siraj's motion is denied.

**I.     BACKGROUND**

    **a.  Mr. Siraj's Indictment, Trial, and Conviction**

On February 9, 2005, a grand jury returned an indictment charging Mr. Siraj with four counts of conspiracy, arising from a plot to bomb the New York City subway station at 34th Street-Herald Square in Manhattan. Specifically, Mr. Siraj was charged with conspiring to: (1) damage or destroy by means of an explosive, any building or other real property used in interstate commerce, in violation of 18 U.S.C. §§ 844(i) and (n); (2) wreck, derail, set fire to, or disable a public transportation vehicle, in violation of 18 U.S.C. §§ 1993(a)(1) and (a)(8); (3) place a destructive device in a facility used in the operation of a public transportation vehicle without previously obtaining the permission of the public transportation provider, in violation of 18 U.S.C. § § 1993(a)(3) and (a)(8); and (4) unlawfully deliver, place, discharge, or detonate an explosive device in a public transportation system with the intent to cause extensive destruction of such system, likely to result in major economic loss, in violation of 18 U.S.C. §§ 2332f(a)(2) and (a)(1)(B).

The principal issue at trial was Mr. Siraj's defense that he was entrapped by a confidential informant. The jury heard the testimony of the confidential informant, a cooperating co-defendant, and three days of testimony from Mr. Siraj himself, in which he acknowledged his participation in the conspiracy but claimed he was entrapped. In response, the government presented rebuttal testimony from an undercover officer who had contact with the defendant prior to the defendant's meeting the confidential informant. On May 24, 2006, the jury found Mr. Siraj guilty of all counts. On January 4, 2007, the court denied Mr. Siraj's motion for a judgment of acquittal based on his entrapment defense. *United States v. Siraj*, 468 F. Supp. 2d 408, 416 (E.D.N.Y. 2007). On January 8, 2007, Mr. Siraj was sentenced to 30 years' incarceration to be followed by a life term of supervised release. This sentence was based in part on an enhancement for obstruction of justice arising from his perjury, both at a suppression hearing and at trial.

b. **Procedural History**

Mr. Siraj's conviction and sentence were affirmed by the Second Circuit in *United States v. Siraj*, 533 F.3d 99 (2d Cir. 2008), and summary order, 2008 WL 2675826, at *1 (2d Cir. July 9, 2008), cert. denied, 555 U.S. 1200 (2009). Subsequently, Mr. Siraj filed numerous collateral challenges, which are described at *Siraj v. United States*, 2020 WL 1500074, at *1 (E.D.N.Y. Feb. 11, 2020).

c. **Mr. Siraj's Request for Compassionate Release**

Mr. Siraj asserts multiple grounds for compassionate release, including his youth and vulnerability at the time of his offense; his rehabilitation; discriminatory surveillance by law enforcement; and sentencing disparities with his co-defendant and others convicted of what he asserts is similar conduct. Additionally, Mr. Siraj argues that he is at risk of contracting serious complications from COVID-19 because of his diagnosed obesity and hyperlipidemia. Finally, he

argues that conditions of his confinement at the Metropolitan Detention Center ("MDC") during trial, conditions at the Communication Management Unit ("CMU") at FCI Terre Haute in the early years of his incarceration, and conditions during pandemic-related lockdowns at FCI Otisville, where he has been incarcerated since 2011, all support his motion for compassionate release.

### d. Mr. Siraj's Medical Records

In support of his application, Mr. Siraj submitted medical records regarding his treatment at FCI Otisville. These records confirm that he has been diagnosed as "obese with Hyperlipidemia conditions." Dkt. No. 221-1 at 62. They also show that Mr. Siraj refused the Pfizer-BioNTech vaccine on March 31, 2021, and that he received the Johnson & Johnson vaccine on August 25th of the same year. *Id.* at 105. Mr. Siraj tested positive for COVID-19 on January 10, 2022. Medical records from January 16, 2022 indicate that Mr. Siraj had been in "medical isolation since testing positive" for COVID-19, but "remained asymptomatic" throughout. *Id.* at 53. The same record states that Mr. Siraj would make "off color" remarks about how he felt the BOP treated inmates while on isolation but was "[n]ever observed in any acute distress / illness." *Id.* at 52. Records from March of 2022 indicate that, after recovering from COVID-19 in January, Mr. Siraj reported experiencing coughing that had since resolved. *Id.* at 3. They also show that he was experiencing other symptoms, including congestion and shortness of breath when walking long distances. *Id.* The records show that a follow-up appointment would be scheduled after a chest x-ray was completed and reviewed, *id.*, but more recent records were not provided to the court. On February 1, 2023, Mr. Siraj's counsel wrote that, on information and belief, while this motion was pending, Mr. Siraj tested positive for COVID-19 again on January 5, 2023 and was released from medical isolation on January 18, 2023.

## II.    STANDARD OF REVIEW

Prior to the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i) gave the BOP "exclusive power over all avenues of compassionate release." *United States v. Brooker*, 976 F.3d 228, 231 (2d Cir. 2020). With the passage of the Act, the section was amended to allow defendants to bring motions themselves and to give courts the power to grant such motions, "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable," so long as "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). In amending § 3582(c)(1)(A)(i), Congress "freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in [such] motions." *Brooker*, 976 F.3d at 237. "The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'" *Id.* at 237–38 (quoting 28 U.S.C. § 994(t)). The defendant bears the burden of showing that he is entitled to compassionate release. *See, e.g.*, *United States v. Martinez*, 2021 WL 3374530, at *2 (S.D.N.Y. Aug. 2, 2021).[1]

## III. DISCUSSION

Mr. Siraj argues that there are several extraordinary and compelling reasons warranting a reduction of his sentence under the Act. With the understanding that these can be evaluated in "isolation or combination," the court considers each in turn. *Brooker*, 976 F.3d at 238.

### a. Youth, Vulnerability, and Rehabilitation

First, Mr. Siraj argues that his youth and vulnerabilities at the time of his offense, combined with his rehabilitation in prison are extraordinary and compelling. In particular, Mr. Siraj asks the

---

[1] Mr. Siraj has fulfilled § 3582(c)(1)(A)'s requirement that he exhaust his administrative remedies. He sent a letter to the warden of his facility on December 7, 2020, and his request was denied on December 16, 2020.

4

court to consider his attributes at the time of the offense, including that his participation in the conspiracy occurred while he was 21 and 22 years of age, unresolved trauma, cognitive limitations, and susceptibility to peer pressure as a new convert to Sunni Islam.  He also presents evidence of his rehabilitation, including a clean disciplinary record over the last ten years; extensive coursework; letters of support from his family and fellow inmates; and favorable reports from prison staff.  He also asks that the court consider his proposal of an anti-radicalization program, letters written to Muslim youth against religious extremism, as well as his stopping what he represents was an "attempted violent attack" on correctional staff.  Mot. at 9.  Rehabilitation alone cannot justify compassionate release but can weigh in favor of finding extraordinary and compelling reasons when combined with other factors.  *Brooker*, 976 F.3d at 237–38.

Mr. Siraj's letters of support, record of extensive coursework, clean disciplinary record, and positive influence on his fellow inmates at FCI Otisville are impressive.  The court commends Mr. Siraj for his efforts to date and for his positive impact on his fellow inmates in particular.  However, this otherwise exemplary record of rehabilitation is undermined by Mr. Siraj's assertion in his letter to the court that he "would never have been involved in any terrorist plot had I never met the informant . . ."  Dkt. No. 215-3.  Such an assertion is not an acceptance of responsibility, but an attempt to shift blame for extraordinarily serious conduct and to relitigate the underlying facts of his case.  In effect, Mr. Siraj seeks to overturn the jury's rejection of his entrapment defense, even though this court and the Second Circuit have rejected his earlier efforts to do so.  *See Siraj*, 468 F. Supp. 2d at 416; *Siraj*, 2008 WL 2675826, at *1.

Mr. Siraj's claim of innocence, made not once, but multiple times,[2] contradicts his assertion that he has accepted responsibility for his actions, and raises serious questions about the extent of his rehabilitation. In *United States v. Gonzalez*, the defendant similarly moved for compassionate release based on his susceptibility to COVID-19 from obesity, his rehabilitation, and his age at the time he ordered the murder of a gang member. *United States v. Gonzalez*, 2021 WL 1990041, at *1 (D. Conn. Apr. 23, 2021). Though the court observed that the defendant had "done much to better himself while incarcerated," it further found that his denial of full responsibility for the murder was troubling and raised "significant questions about the extent of his rehabilitation and the continuing need to protect the public." *Id.* at *4–5. That Mr. Siraj continues to deny responsibility for his role in the planned attack, which he acknowledged would likely have killed innocent people, presents similar concerns. This court agrees with the court in *Gonzalez* that "accountability lies at the heart of rehabilitation." *Id.*; *see also United States v. Henry*, 2020 WL 3791849, at *3 (E.D.N.Y. July 6, 2020) ("Henry's rehabilitation argument is undermined by the fact that Henry has never accepted responsibility for his offense and has continued to challenge aspects of his criminal case even after his post-trial motions and appellate arguments were roundly rejected.").

That Mr. Siraj continues to deny full responsibility at a now unquestionably mature age similarly undermines his argument that his actions can be attributed to "a lack of maturity and an underdeveloped sense of responsibility" at the time of his offense. Mot. at 36 (citing *Roper v. Simmons*, 543 U.S. 551, 569 (2005)). Mr. Siraj's offense can also be distinguished from the "high-

---

[2] For example, in his letter titled "Letter to Muslim Youth Warning Against Extremism and Islamic Violence," Mr. Siraj wrote ". . . I am sincerely giving advice to all with my own personal experience being charged with terrorism which I am innocent of and many of you know about me. I was charged for what I said." Dkt. No. 215-10 at 2.

pressure, time-sensitive" contexts in which courts have found that adolescents tend to make riskier decisions. *See, e.g.*, *United States v. Ramsay*, 538 F. Supp. 3d 407, 420 (S.D.N.Y. 2021). Mr. Siraj's offense involved weeks of planning, during which time he did not withdraw from the conspiracy[3] but took affirmative steps to plan the attack. *See United States v. Gallego*, 2021 WL 4803784, at *1 (S.D.N.Y. Aug. 19, 2021) (defendant's youth at the time of his conviction for murder and armed robbery did not support compassionate release where the offense had been "carefully planned" for months and was "deliberately carried out."). Nor can Mr. Siraj's actions be reasonably understood as the product of peer pressure. In contrast to the defendant in *Ramsay*, Mr. Siraj was not ordered to plan an attack, but initiated the discussion to take action with his co-defendant. *See* Trial Transcript ("Tr.") at 1974–75. On his own initiative, Mr. Siraj presented his co-defendant's plan to bomb bridges, police precincts, and prisons to the confidential informant. Tr. at 600–08, 698–708. Without any direction from either his co-defendant or the confidential informant, he admittedly chose the Herald Square subway station at 34th Street as the target for the attack. Tr. at 749, 1993, 2762–64, 2977–78. Under these circumstances, the court finds that Mr. Siraj's claimed rehabilitation and vulnerabilities at the time of his offense do not support compassionate release.

### b. Alleged Sentencing Disparities

Mr. Siraj next argues on several grounds that the length of his sentence constitutes an extraordinary and compelling reason to grant his motion. He first cites the disparity between his

---

[3] Nor is the court persuaded by Mr. Siraj's arguments that he attempted to withdraw from the conspiracy or would have done so if given more time. Mot. at 19. A defense of withdrawal requires the defendant to "show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy . . ." *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011) (quoting *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir.2008)). Mr. Siraj, despite his vacillation, ultimately agreed to act as a lookout during the attack. At trial, the defense disavowed any withdrawal defense.

7

sentence and that of his co-defendant, arguing that he was penalized for asserting his right to trial. While the government notes that a court is not required to consider or explain sentencing disparities among co-defendants under the sentencing factors, *United States v. Roman*, 2022 WL 363909, at *1 (2d Cir. Feb. 8, 2022) (citing *United States v. Alcius*, 952 F.3d 83, 89 (2d Cir. 2020) (per curiam)), courts may consider such disparities as a ground for demonstrating extraordinary and compelling circumstances for co-defendants with similar conduct. *United States v. Lugo*, 2022 WL 732153, at *8 (E.D.N.Y. Mar. 11, 2022).

The court is not persuaded that the 25-year difference in the sentence Mr. Siraj received can be attributed to his exercise of his constitutional right to trial rather than the stark difference between his conduct and that of his co-defendant. In contrast with his co-defendant, who immediately accepted responsibility for his actions, Mr. Siraj obstructed justice and received a sentence enhancement for doing so.[4] Dkt. No. 198 at 26. While his co-defendant's conduct in planning the attack was similarly egregious, he is also less culpable as a diagnosed schizophrenic. Tr. at 1944–46, 2018. As Mr. Siraj acknowledges, his co-defendant also chose to cooperate as a witness. *See United States v. Pope*, 2022 WL 18276930, at *2 (S.D.N.Y. Nov. 1, 2022). Under these circumstances, the sentencing disparity with his co-defendant does not support compassionate release.

Mr. Siraj similarly argues that his sentence is disproportionate to other terrorism-related cases that he claims involved similar conduct. As the government notes, defendants in many of the cases relied upon by Mr. Siraj pled guilty, likely in exchange for reduced sentences. And,

---

[4] Though Mr. Siraj claims that "[t]he harsh conditions at MDC and Mr. Siraj's general lack of preparation greatly affected his coherence and mental state at trial," Mot. at 23, the court found, as required for the enhancement to apply, "that the defendant lied at the trial with the willful intent to persuade the jury rather than as a result of confusion, mistake or faulty memory or some other innocent reason." Dkt. No. 198 at 24.

8

unlike cases which involve conspiracies to train and recruit individuals, *see e.g.*, *U.S. v. Shah*, No. 1:05-cr-00673 (S.D.N.Y. Nov. 13, 2007), ECF No. 173, or provide material support to terrorist organizations, *U.S. v. Hendricks*, No. 1:16-cr-00265 (N.D. Ohio Mar. 19, 2019), ECF No. 152, Mr. Siraj was charged with a conspiracy to directly engage in acts of terrorism.

A sentence of 30 years is consistent with cases involving more similar conduct. *See United States v. Rezwanul Ahsan Nafis*, No. 12-cr-00720 (E.D.N.Y. Aug. 9, 2013), ECF No. 41 (defendant sentenced to 30 years for attempted use of weapons of mass destruction in connection with a plot involving an informant to bomb Federal Reserve Bank of New York); *see also United States v. Booker*, 704 F. App'x 787, 788 (10th Cir. 2017) (defendant sentenced to 30 years for attempted use of a weapon of mass destruction and attempted destruction of government property by fire or explosion for plot involving an informant to bomb a military base). Furthermore, none of the cases Mr. Siraj cites involved a defendant who received a sentence enhancement for obstruction of justice.

The most factually similar authority Mr. Siraj cites, *United States v. Nur*, No. 07-CR-543 (E.D.N.Y. Jan. 25, 2011), weighs against any reduction in his sentence. In that case, which involved a conspiracy to detonate fuel tanks and a fuel pipeline under John F. Kennedy airport, defendant Abdel Nur, who pled guilty to a lesser charge, received fifteen years for his role in the conspiracy, which included arranging a meeting between its members. *United States v. Kadir*, 718 F.3d 115, 119 (2d Cir. 2013). Mr. Siraj compares his sentence to that of Nur, but Mr. Siraj's conduct more closely resembles that of Nur's co-defendant Russell Defreitas, who admitted to having a leadership role in the plot, monitored the location of the attack with a confidential informant, and was sentenced to life in prison. *Id.* at 120. While the sentencing guidelines in Mr. Siraj's case similarly included the possibility of life in prison, he received a sentence at the lowest

9

end of the applicable guidelines range. Under these circumstances, I do not find that the disparities alleged by Mr. Siraj are extraordinary and compelling.

Mr. Siraj also argues that his sentence is "unconscionable" given the New York Police Department's alleged surveillance of Muslim businesses. Mot. at 45. Assuming the facts asserted regarding this surveillance are true, Mr. Siraj has not demonstrated that compassionate release in his case is the correct remedy. Mr. Siraj asserts that, absent that conduct, he "would not be in prison" for his offense. Mot. at 46. But the full implication of this argument is not clear. To the extent Mr. Siraj here argues that, without the conduct of the NYPD, he would not have been caught, the court is not persuaded that this circumstance is extraordinary and compelling. How it came about that there was an undercover officer who went to the bookstore where Mr. Siraj was working and provided information to the NYPD of potential criminal activity does not alter Mr. Siraj's culpability or justify compassionate release in this case.

Moreover, Mr. Siraj's assertion that the undercover officer provided "virtually all" evidence to overcome the entrapment defense (and to demonstrate that Mr. Siraj repeatedly lied under oath) is incorrect; and even if it were correct, it would be unavailing. The factual issue of entrapment was at the heart of Mr. Siraj's defense, and it was for the jury to decide. In addition to the undercover officer, the jury heard uncontradicted testimony from Mr. Siraj's co-defendant who testified that Mr. Siraj made statements indicating his willingness to carry out a bombing in New York City as revenge for America's ill treatment of Muslims. Tr. at 1973–77. His co-defendant also testified that Mr. Siraj actively analyzed and refined the co-defendant's plan to blow up bridges and police precincts before presenting that plan to the confidential informant. Tr. at 1973–77; 1983–87. The jury also heard Mr. Siraj's own testimony that he came up with the plan to detonate explosives in the Herald Square subway station after his co-defendant's plan had been

10

abandoned. Tr. at 2977–78. Based on these facts, the court does not find that Mr. Siraj's argument presents an extraordinary and compelling reason for compassionate release.

### c. COVID-19 Risk and Conditions of Confinement

Finally, Mr. Siraj argues that the COVID-19 pandemic and the conditions of his confinement justify compassionate release.

#### i. COVID-19 Risk

First, Mr. Siraj argues that his susceptibility to COVID-19 because of his diagnosed obesity and hyperlipidemia support his compassionate release. Unfortunately, the risk of contracting COVID-19 is not merely theoretical for Mr. Siraj. According to submissions to the court, Mr. Siraj has contracted and recovered from COVID-19 twice. Dkt. No. 221-1; Dkt. No. 223. As a result of his first infection, Mr. Siraj describes a harrowing initial four days in confinement during which he suffered fever and body aches among other symptoms. The medical records Mr. Siraj submitted indicate that he was monitored during this time by medical staff, remained asymptomatic, and was "[n]ever observed in any acute distress." Dkt. No 221-1 at 52–53. They also indicate that, in response to Mr. Siraj's email message seeking care for symptoms of COVID-19, he was added to the sick call schedule. Mr. Siraj has provided no indication of the severity of his second infection.

As courts and the Center for Disease Control have recognized, obesity places inmates at an elevated risk for COVID-19 infections. *See, e.g.*, *United States v. Garcia*, 2021 WL 1616914, at *4 (E.D.N.Y. Apr. 26, 2021); *People with Certain Medical Conditions*, www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Mar. 17, 2023). However, Mr. Siraj was vaccinated, reducing the risk of re-infection and severity of the virus. Dkt. No. 221-1 at 105. Mr. Siraj argues that the

Johnson & Johnson vaccine he received provides insufficient protection from COVID-19. Mot. at 51. However, the available vaccines (Pfizer, Moderna, and Johnson & Johnson) have been shown to be highly effective at preventing infection and, when breakthrough infections occur, at reducing the severity of symptoms. *See The Possibility of COVID-19 after Vaccination: Breakthrough Infections*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last accessed Mar. 17, 2023). Furthermore, medical records indicate that Mr. Siraj was offered the Pfizer vaccine prior to taking the Johnson & Johnson vaccine but declined it. Dkt. No. 221-1 at 105. Mr. Siraj also does not dispute the government's assertion that a booster vaccine remains available at his facility, though he has chosen not to take one. Though Mr. Siraj's motion describes difficulty obtaining medical care, his medical records demonstrate that he has been in touch regularly with medical staff who have examined him on multiple occasions. These records indicate that, while he experienced coughing after first having COVID-19, it has since subsided. *Id.* at 2. The latest medical records submitted to the court also indicate that medical staff would follow up with Mr. Siraj after reviewing his chest x-ray report. *Id.* at 2. Based on the evidence currently before the court, Mr. Siraj's circumstances are not extraordinary and compelling.

### ii. Conditions of Confinement

Finally, Mr. Siraj asserts that the conditions of his confinement justify compassionate release. First, he cites his treatment as an "extremely dangerous" inmate early on in his incarceration, including his confinement to the Special Housing Unit at the MDC, and in a CMU at FCI Terre Haute. Second, Mr. Siraj alleges that he was subjected to verbal abuse and inadequate infrastructure at FCI Terre Haute during his detention from 2007 to 2011. Third, Mr. Siraj argues

12

that he has been in "perpetual lockdown" because of the pandemic at FCI Otisville and has been unable to follow his prescribed regimen of diet and exercise. Mot. at 50.

The first two grounds asserted are not extraordinary and compelling. Restrictive conditions of confinement, when imposed "in the interest of institutional safety and security of inmates and staff," have not been found on their own to justify compassionate release. *See United States v. Williams*, 2021 WL 1091905, at *5 (E.D.N.Y. Mar. 22, 2021) (isolation in Special Housing Unit for inmate because of his gang affiliation and subsequent isolation as a result of his COVID-19 diagnosis found insufficient to justify compassionate release). The court does not dismiss the pain and mental anguish that Mr. Siraj says he experienced as a result of verbal abuse; however, it is not sufficient in itself to warrant compassionate release. *See United States v. Yang*, 2022 WL 901592, at *2 (S.D.N.Y. Mar. 27, 2022).

Moreover, Mr. Siraj has not been subject to the alleged conditions in either facility since he was transferred to Otisville over ten years ago. Mr. Siraj's transfer to a different facility with improved conditions detracts from the weight of his argument. *See United States v. Piletas*, 2022 WL 1607526, at *3 (S.D.N.Y. May 20, 2022); *see also United States v. Perkins*, 2022 WL 2980547, at *6 (W.D. Pa. July 28, 2022); *United States v. Parsons*, 2021 WL 2003212, at *3 (E.D. Cal. May 19, 2021).

Mr. Siraj also argues that his conditions of confinement at FCI Otisville have been made more restrictive by the COVID-19 pandemic. The court is mindful that the pandemic has made the conditions of confinement harsher and more punitive for inmates, particularly for those with serious comorbidities such as obesity. At the height of the pandemic, these factors were found to support compassionate release. *See, e.g.*, *United States v. Rodriguez*, 492 F. Supp. 3d 306 (S.D.N.Y. 2020). However, courts more recently have been reluctant to apply a sentence reduction

13

where "the defendant's medical conditions are under control" and where the defendant is vaccinated. *United States v. Mustafa*, 2023 WL 2016581, at *4 (S.D.N.Y. Feb. 15, 2023) (quoting *United States v. Sanchez*, 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022)). Since Mr. Siraj's motion was filed, Otisville's COVID-19 risk level, which had been high, has been adjusted down to level 1 (Green), which means that medical isolation rates are below 2%. *See FCI Otisville*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/otv/ (last accessed Mar. 17, 2023). As relevant to Mr. Siraj's application, this also means that normal recreation schedules have resumed, and he should be able to resume his prescribed regimen of diet and exercise. *See COVID-19 Modified Operations Plan & Matrix*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last accessed Mar. 17, 2023). And as discussed above, Mr. Siraj has been vaccinated against COVID-19. Given these circumstances, "[t]he harshness of the pandemic and the risk to [d]efendant's health have now been mitigated to the point that there are no extraordinary and compelling reasons for a sentence reduction at this time." *Mustafa*, 2023 WL 2016581, at *4.

### IV. CONCLUSION

For the reasons stated above, Mr. Siraj's motion is denied.

**SO ORDERED.**

       /S/
**NINA GERSHON**
**United States District Judge**

March 17, 2023
Brooklyn, New York